IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIONTAE MACK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 19 CV 4001 |
| | ) | |
| v. | ) | Chief Judge Rebecca R. Pallmeyer |
| | ) | |
| CITY OF CHICAGO; DETECTIVE | ) | COMPLAINT FOR VIOLATION OF |
| W. DAVIS, STAR NO. 21157; | ) | CIVIL RIGHTS |
| DETECTIVE PAUL MADERER, | ) | |
| STAR NO. 21246; DETECTIVE | ) | |
| ROBERTS, STAR NO. 20764; SGT. | ) | **JURY DEMANDED** |
| HOOVER, STAR NO. 2346; P.O | ) | |
| BARNES, STAR NO. 8426; P.O. RAY | ) | |
| STAR NO. 6817, | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, KIONTAE MACK, hereby complains against Defendants CITY OF CHICAGO, DETECTIVE W. DAVIS, DETECTIVE PAUL MADERER, DETECTIVE DAVID ROBERTS, SGT. HOOVER, P.O. BARNES, and P.O. RAY as follows:

## INTRODUCTION

**Kiontae Mack is yet another African-American male victim of the Chicago Police Department's Code of Silence historically perpetuated by the City of Chicago and condoned by the Office of the Cook County State's Attorney**

1. In August 2012, the Chicago Police Department was under increasing public scrutiny for its inability to tamp down on violence plaguing the city,

particularly on the South and West Sides of Chicago. Former Chicago Mayor Rahm Emanuel had publicly complained that the police had gone "fetal" in their investigations of violent crime, particularly crimes involving gun violence.

2.     At the same time, former Chicago Mayor Rahm Emanuel was well aware that within the Chicago Police Department there was a "Code of Silence" that had been endorsed and encouraged by the Defendant CITY OF CHICAGO through policies, customs and practices promoted by Defendant CITY OF CHICAGO, including failing to supervise, monitor and discipline officers and/or supervisors when they routinely submitted police reports or gave testimony in criminal proceedings which contained false information; either by affirmative statements which officers knew to be false when given, or by omitting relevant information which rendered the reports and/or testimony false or materially misleading.

3.     The Defendant CITY OF CHICAGO's failure to properly supervise, monitor and discipline officers for submitting false reports and/or fabricating evidence during the course of ongoing criminal investigations emboldened police officers within the Chicago Police Department to engage in the routine practice of fabricating evidence, which included, but was not limited to, the practice of making false and/or materially misleading statements during the course of criminal investigations and subjected suspects to coercive and unduly suggestive investigatory techniques even if the end result could, and frequently did, lead to the knowing and intentional commencement of criminal charges against innocent

citizens who investigating officers and detectives knew to be innocent and had committed no crimes.

4.      Within the Chicago Police Department, officers were emboldened to engage in the routine practice of making false and/or materially misleading statements during the course of criminal investigations because officers knew that there was little, if any, risk of the officers being subjected to any form of professional discipline, much less, criminal prosecution.

5.      Historically, the disciplinary mechanism within the Chicago Police Department has been a "paper tiger," in the sense that while the Chicago Police Department enacted general and special orders which, on paper, prohibit dishonest conduct by its officers, the simple reality is that those general and special orders were never meaningfully enforced by the chain of command of the Chicago Police Department and its officers were well aware of this reality.

6.      Indeed, current Chicago Police Superintendent Eddie Johnson has publicly stated that after 27 years with the Chicago Police Department he had never witnessed police misconduct.

7.      The net result of non-existent enforcement of Chicago Police Department general and special orders intended to curb police officer misconduct has been for officers to routinely engage in misconduct including, but not limited to, fabricating evidence; conducting coercive and/or unduly suggestive interrogation techniques used to procure false confessions from innocent persons, particularly from juveniles and/or persons with special needs or low intellectual faculties; making false statements in police reports and other

police department records which would then be used in criminal investigations and to initiate criminal proceedings; and giving false and/or materially misleading testimony in criminal proceedings, which included hiding exculpatory evidence.

8.      Consequently, police officers within the Chicago Police Department, including Defendants, knew that they could engage in such conduct with impunity because there was never any serious risk of them being subjected to internal discipline and/or criminal prosecution by the Office of the Cook County State's Attorney.

9.      Elected in 2008, former Cook County State's Attorney Anita Alvarez was a career prosecutor who routinely ignored complaints about police misconduct, particularly when voiced by members of the African-American community. During her tenure as Cook County State's Attorney, which included the time period relevant to this Complaint, Alvarez and her supervisory staff often turned a blind eye to instances where police officers made false statements in police reports or while under oath in criminal proceedings.

10.     While this practice by the Office of the Cook County State's Attorney to condone official misconduct by the Chicago Police Department was well known within the practicing bar of the Cook County criminal courts, it was difficult to conclusively prove until November 2015.

11.     In November 2015, Cook County Associate Judge Franklin Valderrama entered his ruling in the Freedom of Information Act litigation captioned *Kalven v. City of Chicago*, ordering, over objection by the Office of the Corporation Counsel for

the City of Chicago, the release of the now infamous bodycam footage capturing the fatal police-involved shooting death of African-American teenager Laquan McDonald at the hands of Caucasian former Chicago Police Officer Jason Van Dyke.

12. Prior to the disclosure of the Laquan McDonald shooting video, it was a historic routine practice of Chicago police officers and detectives to create self-serving narratives used to incriminate African-American citizens of crimes that they did not commit or, alternatively, to exaggerate allegations of criminal conduct to increase -- qualitatively and quantitatively -- charges brought against African-American citizens, particularly young African-American males, such as Plaintiff KIONTAE MACK.

13. Illustrative, but non-exhaustive, examples of this historic routine practice include highly publicized accounts of false narratives and accounts advanced by Defendant CITY OF CHICAGO to conceal the numerous instances of police torture perpetrated by former Chicago Police Department Commander John Burge against predominately African-American males; the wrongful convictions procured through coercive measures employed by Chicago Police Department Detective Reynaldo Guevarra against, again, predominately African-American males for crimes that they did not commit; and the wrongful convictions procured through the coercive measures employed by Chicago Police Officer Ronald Watts, including framing innocent African-American males for crimes that they did not commit.

14. It was only after the court-ordered disclosure of the video footage capturing Laquan McDonald's murder by former Chicago Police Officer Jason Van

Dyke, and the resulting public outcry, that former Cook County State's Attorney Anita Alvarez reluctantly initiated criminal charges against Jason Van Dyke, which was then prosecuted by an outside independent special prosecutor from Kane County.

15. The "Code of Silence" has been so prevalent within the Chicago Police Department that its existence has been admitted by both former Chicago Mayor Rahm Emanuel and current Chicago Mayor Lori E. Lightfoot.

16. Former Chicago Mayor Rahm Emanuel publicly stated "I am looking for a new leader of the Chicago Police Department to address the problems at the very heart of the policing profession. The problem is sometimes referred to as the 'Thin Blue Line.' The problem is other times referred to as the 'Code of Silence.' It is this tendency to ignore; it is the tendency to deny; it is the tendency in some cases to cover-up the bad actions of a colleague or colleagues. No officer should be allowed to behave as if they are above the law just because they are responsible for upholding the law. Permitting and protecting even the smallest acts of abuse by a tiny fraction of our officers leads to a culture where extreme acts of abuse are more likely, just like what happened to Laquan McDonald."

17. Chicago Mayor Lori E. Lightfoot publicly stated that "the Code of Silence exists in the Chicago Police Department (CPD) just as it does in virtually every organization. The important point is that a code of silence among police

officers can result in deadly consequences. Reforming the CPD must start with eliminating a culture of lying. CPD can no longer tolerate police officers who intentionally lie in the discharge of their duties, either by commission or omission."

18.     Police Superintendent Eddie Johnson, the highest-ranking officer within the Chicago Police Department ultimately responsible for holding police officers accountable for misconduct has publicly contradicted himself, initially denying the existence of a Code of Silence during the administration of former Mayor Rahm Emanuel and then admitting its existence after Lori E. Lightfoot was elected Mayor of the City of Chicago in 2019.

19.     Plaintiff KIONTAE MACK is one of the many innocent citizens who was so victimized by the Code of Silence aptly described by former Chicago Mayor Rahm Emanuel and current Chicago Mayor Lori E. Lightfoot.

20.     The 4900 south block of Drexel Boulevard in Chicago, Illinois, is a predominately African-American residential neighborhood and is the home of the national headquarters of Operation PUSH (People United to Save Humanity) Dr. King's Workshop, located at 4955 South Drexel Boulevard; and Reavis Elementary Math and Science Special School, located at 834 E. 50th Street.

21.     On August 25, 2012, Plaintiff KIONTAE MACK was a 17-year-old African-American male who was lawfully sitting on the steps outside of Operation PUSH.

22.     At the time, Plaintiff KIONTAE MACK was a student matriculating into his junior year at Dunbar Vocational High School, twice previously being held

back due to a learning disability. Prior to August 2012, Plaintiff KIONTAE MACK had no prior criminal convictions or arrests. He had committed no crime and was not the subject of any active pending arrest warrant or criminal investigation. He simply was an African-American youth exercising his lawful right to be out in public.

23. Despite having committed no crime, Plaintiff KIONTAE MACK was detained by the Chicago Police Department and, ultimately, falsely charged with the August 25, 2012 murder of Stephin Williams. At all times relevant herein, the Defendants knew Plaintiff KIONTAE MACK had never committed any crime.

24. On October 10, 2012, Defendants initiated criminal proceedings against Plaintiff KIONTAE MACK in the case captioned *People of the State of Illinois v. Kiontae Mack*, 12 CR 1794102 for one count of first-degree murder, one count of second-degree murder, four counts of involuntary manslaughter, two counts of armed robbery with a firearm, and two counts of vehicular invasion. Plaintiff KIONTAE MACK was and is actually innocent of these charges. The Defendants knew that Plaintiff KIONTAE MACK was innocent of all charges during the course of their investigation when they initiated the criminal proceeding against him and during the entirety of that criminal proceeding.

25. Plaintiff KIONTAE MACK was and is actually innocent of all of these charges because on August 25, 2012 he was never in possession of a firearm, never discharged a firearm, never threatened anyone with a firearm, and never attempted

to invade a vehicle, as alleged in the criminal proceeding unlawfully initiated against Plaintiff KIONTAE MACK.

26. The Defendants initiated the criminal proceeding based on fabricated reports and misinformation supplied by the Defendants during the course of their investigation of the August 25, 2012 shooting of Stephin Williams and during the subsequent criminal proceeding in the Circuit Court of Cook County, which ultimately resulted in a jury finding Plaintiff KIONTAE MACK not guilty of all charges on June 16, 2017.

27. After the jury found Plaintiff KIONTAE MACK not guilty, he was released from the custody of the Cook County Department of Corrections on or about June 16, 2017. By the time of his release from custody, Plaintiff KIONTAE MACK had been unlawfully detained as a result of the unlawfully commenced criminal proceeding for approximately five (5) years for crimes that Plaintiff KIONTAE MACK did not commit.

## JURISDICTION AND VENUE

28. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. § 1331 and § 1343(a), the Constitution of the United States.

29. Venue is proper in the Northern District of Illinois, Eastern Division, under 28 U.S.C. §1391 because the acts and events giving rise to the complaint occurred in the Northern District of Illinois, Eastern Division and because, upon information and belief, the Defendants reside here.

## PARTIES

30.     Plaintiff KIONTAE MACK is a citizen of the United States and resident of Chicago, Illinois. At the time of the events at issue, Plaintiff KIONTAE MACK was residing in Chicago when Defendants unlawfully initiated a criminal proceeding against him for the August 25, 2012 murder of Stephin Williams.

31.     Defendant CITY OF CHICAGO is and was, at all times mentioned herein, an Illinois municipal corporation organized and existing as such under the laws of the State of Illinois.

32.     Defendant DETECTIVE DAVID ROBERTS, Star Number 20764 is and was, at all times herein mentioned, a citizen of the United States residing within the jurisdiction of this Court. At all times herein mentioned, he was acting under color of state law and within the scope of his employment for the CITY OF CHICAGO. He is being sued in his individual capacity.

33.     Defendant DETECTIVE PAUL MADERER, Star Number 21246, is and was, at all times herein mentioned, a citizen of the United States residing within the jurisdiction of this Court. At all times herein mentioned, DETECTIVE PAUL MADERER was acting under color of state law and within the scope of his employment for the CITY OF CHICAGO. DETECTIVE PAUL MADERER is being sued in his individual capacity.

34.     Defendant SGT. HOOVER, Star Number 2346, is and was, at all times herein mentioned, a citizen of the United States residing within the jurisdiction of this Court. At all times herein mentioned SGT. HOOVER was acting under color of

state law and within the scope of SGT. HOOVER's employment for the CITY OF CHICAGO. SGT. HOOVER is being sued in SGT. HOOVER's individual capacity.

35.     Defendant DETECTIVE W. DAVIS, Star Number 21157, is and was, at all times herein mentioned, a citizen of the United States residing within the jurisdiction of this Court. At all times herein mentioned, DETECTIVE W. DAVIS was acting under color of state law and within the scope of DETECTIVE W. DAVIS' employment for the CITY OF CHICAGO. DETECTIVE W. DAVIS is being sued in DETECTIVE W. DAVIS' individual capacity.

36.     Defendant P.O. BARNES, Star Number 8426, is and was, at all times herein mentioned, a citizen of the United States residing within the jurisdiction of this Court. At all times herein mentioned, P.O. BARNES was acting under color of state law and within the scope of P.O. BARNES' employment for the CITY OF CHICAGO. P.O. BARNES is being sued in P.O. BARNES' individual capacity.

37.     Defendant P.O. RAY, Star Number 6817, is and was, at all times herein mentioned, a citizen of the United States residing within the jurisdiction of this Court. At all times herein mentioned, P.O. RAY was acting under color of state law and within the scope of P.O. RAY's employment for the CITY OF CHICAGO. P.O. RAY is being sued in P.O. RAY's individual capacity.

## FACTS COMMON TO ALL CLAIMS

### The August 25, 2012 Shooting and Murder of Stephin Williams

38.     On August 25, 2012, Stephin Williams was an Assistant Manager employed at a Walgreens pharmacy in the Roseland neighborhood on the far South Side of Chicago. He and his co-worker, Breonna Clausell, decided to grab dinner

after work.

39.     After purchasing meals, Williams drove Clausell to her residence in the 4900 south block of Drexel Boulevard, parking his vehicle outside of Clausell's apartment building.

40.     While parked outside of Clausell's apartment building and eating their meals in Williams' car, two (2) men approached Williams' car; one male approached the driver's side where Williams sat, and another approached Clausell who was sitting in the passenger side.

41.     The man who approached Williams brandished a handgun and demanded that Williams open his car door and for Williams to give all of his property to the gunman. The other man, who Clausell could not see, attempted to grab Clausell's purse.

42.     After a brief exchange, Williams was shot, and the two men fled.

43.     Defendants SGT. HOOVER, DETECTIVE ROBERTS, OFFICER BARNES, DETECTIVE W. DAVIS, OFFICER RAY and DETECTIVE MADERER responded to the scene of the crime.

44.     Williams died several hours later at the hospital.

**Kiontae Mack was detained for lawfully running away from a late-night shooting**

45.     Plaintiff KIONTAE MACK had committed no crime and was lawfully sitting on the front steps of the national headquarters of Operation Push at 4955 S. Drexel Avenue.

46.     On August 25, 2012, Plaintiff KIONTAE MACK had no outstanding

warrants for his arrest.

47.     On August 25, 2012, Plaintiff KIONTAE MACK was not in the possession of any unlawful weapons.

48.     On August 25, 2012, Plaintiff KIONTAE MACK was not in the possession of any chemical substances.

49.     On August 25, 2012, as Williams was being shot, Plaintiff KIONTAE MACK was across the street standing in front of Operation PUSH with a group of several other African-American youths.

50.     Upon hearing the gunshots, Plaintiff KIONTAE MACK and the youths scattered.

51.     Several minutes later, University of Chicago Police Officers observed Plaintiff KIONTAE MACK, detained him, and brought him back to shooting scene, placing him in the custody of the Defendants, including but not limited to, Defendants SGT. HOOVER, DETECTIVE ROBERTS, OFFICER BARNES, DETECTIVE W. DAVIS, OFFICER RAY and DETECTIVE MADERER.

52.     When Plaintiff KIONTAE MACK was taken back to the shooting scene, SGT. HOOVER conducted a "show up" by having Breonna Clausell look at him in order to determine whether Plaintiff KIONTAE MACK was the person who shot Stephin Williams. Upon information and belief, Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER assisted SGT. HOOVER in conducting the show up, which was conducted in the presence of the University of Chicago policer officers who initially detained and brought Plaintiff KIONTAE MACK to the shooting scene.

53.     On August 25, 2012, Breonna Clausell did not identify Plaintiff KIONTAE MACK as the person who she witnessed shoot Stephin Williams.

54.     To the contrary, on August 25, 2012 Breonna Clausell identified Michael Tucker as the person who she witnessed approach and shoot Stephin Williams and was unable to identify the other individual who approached the vehicle with Tucker.

55.     The fact that Breonna Clausell had failed to identify Plaintiff KIONTAE MACK during the "show up" was contemporaneously documented by the University of Chicago Police Department.

56.     At no time in the University of Chicago incident report is Plaintiff KIONTAE MACK noted to have been the person who Breonna Clausell identified as the person who shot Stephin Williams earlier that day, or as being otherwise involved in the Stephin Williams shooting.

57.     The Chicago Police Department original case incident report authored by Defendant P.O. Barnes states that Breonna Clausell could not positively identify Plaintiff KIONTAE MACK. However, in a later arrest report authored by Defendant P.O. Barnes, he contradicts his prior report and falsely states that Breonna Clausell "tentatively identified" Plaintiff Kiontae Mack.

58.     Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that Breonna Clausell failed to identify Plaintiff KIONTAE MACK at the "show up."

59.     Despite the knowledge that Breonna Clausell failed to identify

Plaintiff KIONTAE MACK, Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER caused Plaintiff to be subjected to a legal process, criminal prosecution, pretrial detention and a deprivation of his liberty without probable cause.

60.     Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, OFFICER RAY, DETECTIVE W. DAVIS, OFFICER BARNES, and SGT. HOOVER fabricated evidence and falsified police reports including but not limited to falsely claiming that Breonna Clausell identified Plaintiff KIONTAE MACK on the night of the incident.

61.     Defendants DETECTIVE DAVID ROBERTS, DETECTIVE W. DAVIS, and SGT. HOOVER fabricated evidence in their testimony at Plaintiff KIONTAE MACK's criminal proceedings.

### The unduly suggestive and coercive interrogation of Kiontae Mack by Detectives Roberts and Maderer to fabricate a false implication of guilt by Kiontae Mack

62.     After the show-up on scene, Plaintiff Kiontae Mack was transported from the shooting scene to Area Central Chicago Police Headquarters located at 51st & Wentworth.

63.     Upon his arrival at the police station, Plaintiff KIONTAE MACK was placed in a holding cell and required to strip down to his underwear after Chicago Police evidence technicians confiscated his other clothing to conduct analysis for GSR, gun-shot residue. Upon information and belief, subsequent results revealed that Plaintiff KIONTAE MACK's clothing tested negative for the presence of gun-shot residue, making it impossible for him to have shot Stephin Williams that night.

64. After confiscating Plaintiff KIONTAE MACK's clothing, he was given a paper smock and forced to remain in a cold holding cell which, upon information and belief, had a room temperature of approximately 50 degrees Fahrenheit.

65. For an extensive period of time, which exceeded a minimum of 10-14 hours, Plaintiff KIONTAE MACK was left in the cold holding cell wearing the smock, during which time Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER subjected Plaintiff KIONTAE MACK to highly suggestive and coercive interrogation techniques given the age and mental development of Plaintiff KIONTAE MACK.

66. During the course of their investigation and prior to interrogating Plaintiff KIONTAE MACK, Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER knew that Breonna Clausell had identified Michael Tucker as the shooter, but had not identified Plaintiff KIONTAE MACK as even being present at the shooting.

67. During the course of their investigation and during, as least, portions of their interrogation of KIONTAE MACK, Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER knew that Michael Tucker had admitted that he had, in fact, shot Stephin Williams but that Tucker never identified Plaintiff KIONTAE MACK as aiding Michael Tucker and/or being present when Michael Tucker shot Stephin Williams.

68. During the course of their investigation, Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that there was no physical evidence

connecting Plaintiff KIONTAE MACK with the shooting death of Stephin Williams.

69. During the course of their investigation, Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER made no attempts to conduct a canvass of the 5900 south block of Drexel Boulevard to determine the existence of any other occurrence witnesses of the fatal shooting death of Stephin Williams.

70. During the course of their investigation, where Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER were aware, based on their extensive personal interaction with Plaintiff KIONTAE MACK that based on his affect, tone and overall demeanor, he was demonstrably cognitively "slow" and therefore exceptionally susceptible to manipulation and suggestion.

71. In the absence of any eyewitness account or physical evidence connecting Plaintiff KIONTAE MACK to the shooting death of Stephin Williams, DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER subjected Plaintiff KIONTAE MACK to coercive and suggestive interrogation tactics to exploit his young age, physical vulnerabilities (*i.e.*, sitting almost naked in a near-freezing detention cell) and his visibly "slow" cognitive abilities in order to procure a false confession from Plaintiff KIONTAE MACK which would fit the Defendants' preferred narrative that Plaintiff KIONTAE MACK was standing next to Breonna Clausell when Michael Tucker shot Stephin Williams.

72. During the course of their interrogation, Plaintiff KIONTAE MACK truthfully told Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL

MADERER that he had witnessed Michael Tucker walk across the street and commit the shooting.

73.   Visibly dissatisfied with Plaintiff KIONTAE MACK'S truthful statement about Michael Tucker's actions, DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER immediately began to use profanity-laced language to intimidate Plaintiff KIONTAE MACK, threatening him with "fifty fucking years in prison" no matter what Plaintiff KIONTAE MACK did or said to the detectives.

74.   Defendants DETECTIVE DAVID ROBERTS and DETECTIVE PAUL MADERER used coercive and profanity-laced language to intimidate Plaintiff KIONTAE MACK, falsely stating that if Plaintiff KIONTATE MACK continued to truthfully say that he was simply across the street sitting on the steps of Operation Push while Michael Tucker shot Stephin Williams, then he would be sent to prison for fifty years and come out "an old man."

75.   When Plaintiff KIONTAE MACK offered to take a polygraph test to prove his innocence, Defendant DETECTIVE ROBERTS and DETECTIVE PAUL MADERER said words to the effect "lie detector tests don't matter . . . you're going to go to fucking prison for fifty years!"

76.   Scared after the coercive and threatening manner and language employed by the DETECTIVE ROBERTS and DETECTIVE PAUL MADERER, Plaintiff KIONTAE MACK began making demonstrably inaccurate and equivocal

statements about the shooting directly in response to their suggestive questioning techniques, clearly trying to appease the detectives and tell them what they wanted to hear, even if the answers were obviously incorrect, including how there were "three females in the car."

77. After subjecting Plaintiff KIONTAE MACK to several hours of exhaustive isolation in a cold and uncomfortable detention cell wearing nothing but a smock and his underwear and then subjecting him to a bevy of coercive and suggestive questioning, DETECTIVE ROBERTS and DETECTIVE PAUL MADERER, Plaintiff KIONTAE MACK was then questioned by an Assistant Cook County State's Attorney who asked a series of leading questions intended to inculpate Plaintiff KIONTAE MACK by admitting that he was standing next to the car when Michael Tucker shot Stephin Williams.

78. Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that Plaintiff KIONTAE MACK had not shot Stephin Williams nor assisted Michael Tucker in his shooting of Stephin Williams.

79. Specifically, during the course of the investigation, Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that Breonna Clausell could only identify Michael Tucker as the shooter.

80. During the course of the investigation, the Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS,

OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that no gunshot residue was ever found to be present on the clothing of Plaintiff KIONTAE MACK.

81.     During the course of the investigation, the Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER,  DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that no fingerprints belonging to Plaintiff KIONTAE MACK was ever found to be present on any portion of Stephin Williams' car.

82.     During the course of the investigation, no murder weapon was ever connected to Plaintiff KIONTAE MACK.

83.     During the course of the investigation, no other witnesses to the shooting identified Plaintiff KIONTAE MACK as being a participant in the robbery and/or fatal shooting death of Stephin Williams.

84.     During the course of the investigation, Michael Tucker did not implicate Plaintiff KIONTAE MACK as aiding Michael Tucker in his robbery and/or shooting of Stephin Williams.

85.     The only "evidence" relied upon by the Chicago Police Department to initiate criminal proceedings against Plaintiff KIONTAE MACK were the statements obtained during the course of the suggestive and coercive interrogation conducted by the police detectives on or about August 25, 2012.

86.     During the course of the investigation, Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER BARNES, and SGT. HOOVER fabricated false and misleading police reports concerning the investigation, including multiples report that falsely

indicated that Breonna Clausell positively identified Plaintiff KIONTAE MACK when, in fact, she never made a positive identification of him.

87.     On October 10, 2012, Defendants initiated criminal proceedings against Plaintiff KIONTAE MACK in the case captioned *People of the State of Illinois v. Kiontae Mack*, 12 CR 1794102 for one count of first-degree murder, one count of second-degree murder, four counts of involuntary manslaughter, two counts of armed robbery with a firearm, and two counts of vehicular invasion. Plaintiff KIONTAE MACK was and is actually innocent of these charges. The Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER knew that Plaintiff KIONTAE MACK was innocent of all charges during the course of their investigation, when they initiated the criminal proceeding against him, and during the entirety of that criminal proceeding.

88.     Plaintiff KIONTAE MACK was and is actually innocent of all of these charges because on August 25, 2012 he was never in possession of a firearm, never discharged a firearm, never threatened anyone with a firearm, and never attempted to invade a vehicle, as alleged in the criminal proceeding unlawfully initiated against Plaintiff KIONTAE MACK.

89.     The Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and SGT. HOOVER initiated the criminal proceeding based on fabricated reports and misinformation supplied by the Defendants during the course of their investigation of the August 25, 2012 shooting of Stephin Williams and during the subsequent

criminal proceeding in the Circuit Court of Cook County, which ultimately resulted in a jury finding Plaintiff KIONTAE MACK not guilty of all charges on June 16, 2017.

90.     After the jury found Plaintiff KIONTAE MACK not guilty, he was released from the custody of the Cook County Department of Corrections on or about June 16, 2017. By the time of his release from custody, Plaintiff KIONTAE MACK had been unlawfully detained as a result of the unlawfully commenced criminal proceeding for approximately five (5) years for crimes that Plaintiff KIONTAE MACK did not commit.

## COUNT I
## 42 U.S.C. § 1983 – Illegal Pretrial Detention (*Manuel*)

## Against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, and P.O. Ray

91.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

92.     In the manner described above, Defendants seized and unlawfully detained Plaintiff KIONTAE MACK without probable cause or any lawful justification, in violation of the Fourth Amendment to the U.S. Constitution.

93.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff KIONTAE MACK's constitutional rights.

94.     Plaintiff KIONTAE MACK'S detention of approximately five (5) years was due to the Defendants DETECTIVE DAVID ROBERTS, DETECTIVE PAUL MADERER, DETECTIVE W. DAVIS, OFFICER RAY, OFFICER BARNES, and

SGT. HOOVER's fabricated evidence in their police reports, criminal complaints and/or testimony rendered during the underlying criminal proceeding in the matter captioned *People of the State of Illinois v. Kiontae Mack*, 12 CR 17941.

95.     As a result of this misconduct, Plaintiff KIONTAE MACK was injured, including a loss of liberty, physical and emotional damages, legal fees, trauma, mental distress and emotional damages.

WHEREFORE, Plaintiff KIONTAE MACK demands judgment against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, P.O. Ray, for compensatory damages, punitive damages, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

## COUNT II

### 42 U.S.C. §1983 – Violation of Due Process (Fourteenth Amendment)

**Against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, and P.O. Ray.**

96.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

97.     As described more fully above, all of the Defendants, acting individually, jointly, and/or in conspiracy, deprived Plaintiff KIONTAE MACK of his constitutional right to due process and fair trial.

98.     In the manner described more fully above, the Defendants fabricated false inculpatory statements Plaintiff KIONTAE MACK and from others, deliberately withheld and suppressed exculpatory evidence from the prosecutors and defense counsel, and fabricated false reports and other evidence, thereby

causing the wrongful prosecution of Plaintiff KIONTAE MACK. Absent this misconduct, the criminal prosecution could not and would not have been pursued.

99.     The Defendants misconduct directly resulted in the unjust criminal prosecution and continuing wrongful incarceration of Plaintiff KIONTAE MACK while he awaited trial in the Circuit Court of Cook County, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

100.     As a result of this violation of his constitutional right to a fair trial, Plaintiff KIONTAE MACK suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

101.     The misconduct described in this count was objectively unreasonable and undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

WHEREFORE, Plaintiff KIONTAE MACK demands judgment against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, P.O. Ray, for compensatory damages, punitive damages, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

## COUNT III

### 42 U.S.C. §1983 – Coerced and Inculpatory Statements
### (Fifth and Fourteenth Amendments)

### Against Defendants Paul Maderer and David Roberts

102.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

103.     In the manner described more fully above, the Defendants, including Detectives Paul Maderer and David Roberts, individually, jointly and in conspiracy with one another, as well as under color of law and within the scope of their employment with the City of Chicago, conducted an unconstitutional interrogation of Plaintiff KIONTAE MACK, and coerced him into making involuntary statements implicating himself as an accessory to the August 25, 2012 murder of Stephin Williams outside the national headquarters of Operation PUSH, in violation of Plaintiff KIONTAE MACK's rights secured by the Fifth and Fourteenth Amendments.

104.     The false and involuntary inculpatory statements Defendants Maderer and Roberts obtained from Plaintiff KIONTAE MACK were used against Plaintiff KIONTAE MACK's detriment in his criminal case. The false and involuntary inculpatory statements were the only reason that Plaintiff KIONTAE MACK was prosecuted for in the murder of Stephin Williams.

105.     The misconduct described in this count was objectively unreasonable and was taken intentionally, with malice, with reckless indifference to the rights of Plaintiff KIONTAE MACK, and in total disregard of the truth and Plaintiff KIONTAE MACK's innocence.

106.     As a result of this violation of his constitutional rights to a fair trial, Plaintiff KIONTAE MACK suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

WHEREFORE, Plaintiff KIONTAE MACK demands judgment against Defendants Paul Maderer and David Roberts, for compensatory damages, punitive

damages, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Deprive of Constitutional Rights**

**Against Defendants W. Davis, Paul Maderer, David Roberts,**
**Sgt. Hoover, P.O. Barnes, and P.O. Ray**

107.    Each of the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiff KIONTAE MACK of his constitutional rights.

108.    In so doing, these co-conspirators, Defendants SGT. HOOVER, DETECTIVE ROBERTS, OFFICER BARNES, DETECTIVE W. DAVIS, SGT. WILLIAMS, OFFICER RAY and DETECTIVE MADERER conspired to accomplish an unlawful purpose (the unlawful pre-trial detention of Plaintiff KIONTAE MACK in violation of the Fourth Amendment) by unlawful means(including, falsification of police reports, criminal complaint and giving fabricated testimony during criminal proceedings).

109.    In furtherance of their conspiracy, each of these co-conspirators Defendants SGT. HOOVER, DETECTIVE ROBERTS, OFFICER BARNES, DETECTIVE W. DAVIS, SGT. WILLIAMS, OFFICER RAY and DETECTIVE MADERER committed overt acts and were otherwise willful participants in joint activity.

110.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff KIONTAE MACK's constitutional rights.

111.     As a result of Defendants' misconduct described in this Count, Plaintiff KIONTAE MACK was injured, including a loss of liberty due to his unlawful five-year pre-trial detention, physical and emotional damages, legal fees, trauma, mental distress and emotional damages.

WHEREFORE, Plaintiff KIONTAE MACK demands judgment against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, P.O. Ray for compensatory damages, punitive damages, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

### COUNT V
### 42 U.S.C. § 1983 – Failure to Intervene

### Against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, and P.O. Ray.

112.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

113.     During the constitutional violations described herein, Defendants SGT. HOOVER, DETECTIVE ROBERTS, OFFICER BARNES, DETECTIVE W. DAVIS, OFFICER RAY and DETECTIVE MADERER stood by without intervening to prevent the violation of Plaintiff KIONTAE MACK's constitutional rights, even though they had the opportunity to do so.

114.     Defendants SGT. HOOVER, DETECTIVE ROBERTS, OFFICER BARNES, DETECTIVE W. DAVIS, OFFICER RAY and DETECTIVE MADERER each refused to intervene and report or disclose exculpatory information learned during the course of the underlying criminal investigation in furtherance of the "Code of Silence" within the Chicago Police Department which the Defendant CITY

- 27 -

OF CHICAGO endorses and encourages through policies, customs and practices promoted by Defendant CITY OF CHICAGO.

115.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff KIONTAE MACK's constitutional rights.

116.    As a result of Defendants' misconduct described in this Count, Plaintiff KIONTAE MACK was injured, including a loss of liberty due to his unlawful five-year pre-trial detention, physical and emotional damages, legal fees, trauma, mental distress and emotional damages.

WHEREFORE, Plaintiff KIONTAE MACK demands judgment against Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, P.O. Ray for compensatory damages, punitive damages, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

## COUNT VI
### 42 U.S.C. §1983 - *Monell*

### Against Defendant City of Chicago

117.    Each of the foregoing paragraphs are incorporated as if restated fully herein.

118.    At all times relevant to the events described in this Complaint, and for a period of time prior to and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies and procedures regarding: (a) the arrest, detention and interrogation of individuals, including witnesses, by the Chicago Police Department; (b) the arrest, detention and

interrogation of juveniles; and (c) the arrest, detention and interrogation of persons with mental disabilities.

119.    In addition, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies and procedures for the training, supervision, monitoring and discipline of Chicago Police Officers with respect to: (a) the arrest, detention and interrogation of individuals, including witnesses, by the Chicago Police Department; and (b) the arrest, detention and interrogation of juveniles; and (c) the arrest, detention and interrogation of persons with mental disabilities.

120.    In addition, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies and procedures for the training, supervision, monitoring and discipline of Chicago Police Officers with respect to: (a) accurately, completely and truthfully documenting information obtained during the course of investigations; (b) accurately, completely and truthfully relating information obtained during the course of investigation, whether in written reports or testimony.

121.    In addition, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies and procedures for the training, supervision, monitoring and discipline of Chicago Police Officers with respect to: (a) the creation of false or misleading information during the course of criminal investigations; (b) concealing, by act or omission to act, misconduct by the Chicago Police Department to prevent the detection of officer misconduct (i.e., engaging in a "Code of Silence").

122. The failures to promulgate proper or adequate rules, regulations, policies and procedures caused routine violations of the constitutional rights of citizens of the City of Chicago, including Plaintiff KIONTAE MACK's constitutional rights.

123. In addition, at all time relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices customs of Chicago Police Officers under which: (a) individuals not reasonably suspected of any criminal activity, such as Plaintiff KIONTAE MACK, were routinely stopped, seized, arrested, detained, questioned, and/or interrogated against their will; (b) individuals not reasonably suspected of any criminal activity, such as Plaintiff KIONTAE MACK, had their person or property routinely and unlawfully searched; and (c) individuals who are cognitively "slow" are subjected to unduly coercive and suggestive interrogation techniques under circumstances where the individuals are caused to inculpate themselves based solely on the unduly coercive influence of the police.

124. Specifically, Chicago Police Officers routinely stopped, seized, searched, arrested, detained, questioned, and/or interrogated individuals who were not suspected of criminal activity, against their will, by various means, including but not limited to one or more of the following: (a) Chicago Police Officers entered their homes or places of business without a warrant, probable cause, reasonable suspicion, or any other lawful purpose; (b) Chicago Police Officers stopped, seized, arrested, and/or detained them without a warrant, probable cause, reasonable

suspicion, or any other lawful purpose; (c) Chicago Police Officers search their person or property without a warrant, probable cause, reasonable suspicion, or any other lawful purpose; and (d) Chicago Police Officers questioned and/or interrogated them without a warrant, probable cause, reasonable suspicion or any other lawful purpose, and without proper protection of their constitutional rights to remain silent, to have an attorney present or to be free from coercive or unduly suggestive interrogation practices particularly where the person is acutely susceptible to suggestion.

125. For example, in the 1980s, the *Chicago Reporter* found that tens of thousands of citizens were arrested in Chicago neighborhoods in cases that almost never resulted in a conviction because the Chicago Police Officers would not show up in court to defend the arrest. The American Civil Liberties Union challenged this pattern and practice of illegal arrests in the lawsuit *Michael Nelson v. City of Chicago*, 83 C 1168 (N.D. Ill.).

126. In the 1990s, the pattern of illegal seizures continued with the City's "gang loitering ordinance," under which thousands of citizens were arrested and search without justification. The Supreme Court later declared the practice unconstitutional in *City of Chicago v. Morales*, 527 U.S. 41 (1999).

127. The 2017 United States Department of Justice Report, *Investigation of the Chicago Police Department*, found that a special enforcement unit of Chicago Police officers routinely and improperly stopped and searched Black and Latino community members and seized their property.

128.    In the early 2000s, illegal searches and seizures by the Chicago Police Department remained common. In 2003, the American Civil Liberties Union again filed suit, this time on behalf of Olympic Gold Medalist Shani Davis and others, alleging illegal searches and seizures by Chicago Police officers. *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004).

129.    After Plaintiff KIONTAE MACK's arrest and five-year unlawful detention, a study of arrests by the American Civil Liberties Union found that there were a quarter-million Fourth Amendment seizures in Chicago during the summer of 2014 that did not result in charges. Chicago Police officers conducted half of those seizures without sufficient justification. These seizures occurred disproportionately in African-American communities, such as Plaintiff KIONTAE MACK's.

130.    Prior to her 2019 election as Mayor of the City of Chicago, former federal prosecutor Lori E. Lightfoot served as the Chairperson of the Chicago Police Accountability Taskforce. Among others, newly-confirmed Corporation Counsel Mark Flessner and current Chicago Inspector General Joseph Ferguson also served on the Police Accountability Taskforce.

131.    In April 2016, the Chicago Police Accountability Task Force confirmed that searches and seizures of African-Americans, like Plaintiff KIONTAE MACK, occurred at much higher rates than searches and seizures of the rest of the population.

132.    The examples above demonstrate that the Chicago Police Department's pattern and practice of illegal seizures and searches of Chicago citizens, particularly African-American citizens, like Plaintiff KIONTAE MACK, is longstanding and

widespread.

133.    Many of these illegal seizures have resulted in meritorious lawsuits. Between 2008 and 2016, for example, the City of paid judgments and settlements in a minimum of 700 false arrest cases, paying tens of millions of dollars to citizens whose constitutional rights had been violated by Chicago Police officers.

134.    On information and belief, in that time period, approximately 90% of arrests conducted by Chicago Police officers took place without a warrant.

135.    As explained in the Chicago Police Accountability Task Force's recent report, once arrested extremely few Chicagoans are allowed to consult with counsel while in police custody. Instead, Chicago Police officers provide phone access to the outside world for the first time only after interrogations are complete.

136.    For example, in 2014, just three of every 1,000 arrestees in Chicago Police Department custody were permitted to have contact with an attorney.

137.    Between August 2004 and June 2015, approximately 7,000 people were detained in the Homan Square facility and subjected to illegal interrogation.

138.    Recent Chicago history is replete with examples of illegal interrogations that resulted in the violation of the constitutional rights of citizens, including the notorious John Burge Area Two "midnight crew" torture cases, and the more recent exonerations by African-American Cook County State's Attorney

Kimberly Foxx of scores of African-American men who had been wrongfully charged and/or convicted based on fabricated reports and/or testimony of disgraced officers Reynaldo Guevarra and Ronald Watts.

139.  The violations of Plaintiff KIONTAE MACK's constitutional rights were also caused by the City's failure to adequately train, supervise and discipline its officers. At all relevant times and for a period of time prior thereto: (a) Chicago Police Officers were permitted to stop, seize, search, arrest, detain, question and/or interrogate individuals without proper training; (b) they did not receive proper training with respect to how to completely, accurately and truthfully report and document criminal investigations to ensure that reports were accurate and that criminal prosecutions were based on probable cause rather than fabricated evidence; and (c) employees of the Chicago Police Department formally and informally adhered to a "Code of Silence," whereby Chicago Police officers and their supervisors agreed explicitly and implicitly not to report misconduct by employees of the Chicago Police Department, creating an environment of lawlessness, without discipline, where employees of the Chicago Police Department engaged in misconduct, including the fabrication of false police narratives to justify arrests and subsequent prosecutions, without fear of professional discipline by the Chicago Police Department.

140.  The above persistent and widespread practices and customs are themselves evidence of the City's failure to train, supervise and discipline Chicago Police officers.

141.   In addition, in March 2015, the American Civil Liberties Union found that Chicago Police officers were hardly ever trained to conduct seizures after their initial training at the police academy. The American Civil Liberties Union also found that there was no evidence that Chicago Police seizures were being supervised by responsible Chicago police supervisors.

142.   The U.S. Department of Justice's recent report likewise found that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing and planning required to train a department of approximately 12,000 members, leave officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officer are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

143.   On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when

they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

144. The failure of police supervision and discipline in the City of Chicago during the time period is a fact admitted by City policymakers and Chicago Police Officers.

145. Former Chicago Mayor Rahm Emanuel publicly stated "I am looking for a new leader of the Chicago Police Department to address the problems at the very heart of the policing profession. The problem sometimes is referred to as the 'Thin Blue Line.' The problem is other times referred to as the 'Code of Silence.' It is this tendency to ignore; it is the tendency to deny; it is the tendency in some cases to cover-up the bad actions of a colleague or colleagues. No officer should be allowed to behave as if they are above the law just because they are responsible for upholding the law. Permitting and protecting even the smallest acts of abuse by a tiny fraction of our officers leads to a culture where extreme acts of abuse are more likely, just like what happened to Laquan McDonald."

146. Chicago Mayor Lori E. Lightfoot publicly stated that "the Code of Silence exists in the Chicago Police Department (CPD) just as it does in virtually every organization. The important point is that a code of silence among police

officers can result in deadly consequences. Reforming the CPD must start with eliminating a culture of lying. CPD can no longer tolerate police officers who intentionally lie in the discharge of their duties, either by commission or omission."

147. In December 2016, Dean Angelo, the former President of the police officers' union in Chicago admitted that there is a "Code of Silence" within the Chicago Police Department.

148. In 2017, the U.S. Department of Justice found that current officers of the Chicago Police Department and former high-level officials of the Chicago Police Department acknowledged the existence of a "Code of Silence."

149. In the case of *Klipfel v. Bentsen*, Case No. 94 C. 6415 (N.D. Illinois), tried before the Honorable Blanche M. Manning (retired), a federal jury found that as of 1994 the Chicago Police Department maintained a Code of Silence that facilitated police misconduct.

150. In *Obrycka v. City of Chicago*, Case No. 94 C 6415, tried before the Honorable Amy J. St. Eve, a federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

151. The same Code of Silence and ineffective system of police oversight were in place when Plaintiff KIONTAE MACK's constitutional rights were violated in August 2012.

152. Compounding the problem, as the U.S. Department of Justice has found, "Chicago seldom holds officers accountable for misconduct."

153.    Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

154.    The U.S. Department of Justice "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of the misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

155.    Similarly, the Chicago Police Accountability Task Force, chaired by newly-elected Chicago Mayor Lori E. Lightfoot, reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

156.    Between 2011 and 2015, nearly half of complaints filed against police officers were not even investigated.

157.    More than 95% of complaints against the police are found to be "unsustained."

158.    Less than 2% of complaints against Chicago Police resulted in any discipline.

159.    Out of 3,316 recent complaints of unlawful detention filed against Chicago Police officers, only 20 resulted in any discipline – just slightly more than

one half of one percent of the cases.

160.    All of the above widespread practices and customs, individually and/or collectively were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago of Chicago, including but not limited to former Mayor Rahm Emanuel and current Police Superintendent Eddie Johnson, directly encouraged, allowed, acquiesced in, and/or turned a blind eye to the very type of misconduct discussed above, by failing to adequately train, supervise, and control Chicago Police Officers, by failing to promulgate policies, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses, such as those affecting Plaintiff KIONTAE MACK.

161.    In addition and/or alternatively, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff KIONTAE MACK were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago, or were actually committed by persons with such final policymaking authority.

162.    Plaintiff KIONTAE MACK's injuries were caused by employees of the City of Chicago, including but not limited to the individually named Defendants,

who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging the misconduct described in this Count.

WHEREFORE, Plaintiff KIONTAE MACK demands judgment against Defendant City of Chicago for compensatory damages, a judgment declaring the policies, practices and customs of the City of Chicago to be unconstitutional, costs, reasonable attorneys' fees and such other and additional relief that this Court deems equitable and just.

## COUNT VII
## State Law Claim – Indemnification Under 745 ILCS 10/9-102

### Against Defendant City of Chicago

163.    Each of the foregoing paragraphs are incorporated as if restated fully herein.

164.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 745 ILCS 10/9-102.

165.    Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, P.O. Ray are, or were, employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

166.    Defendant CITY OF CHICAGO is obligated to pay any judgment for compensatory damages entered against individual defendants, Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, and P.O. Ray.

167.     In the event that a judgment for compensatory damages is entered against individual defendants, Defendants W. Davis, Paul Maderer, David Roberts, Sgt. Hoover, P.O. Barnes, and P.O. Ray, Defendant CITY OF CHICAGO must pay the judgment and may pay the associated attorneys' fees and costs.

## JURY DEMAND

Plaintiff KIONTAE MACK hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

s/Jaclyn Diaz

Jaclyn N. Diaz
ED FOX & ASSOCIATES, LTD.
300 W Adams St, Ste 330
Chicago, IL 60606
(312) 345-8877
jdiaz@efoxlaw.com
*Attorney for Plaintiff*