**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kiontae Mack, | |
| *Plaintiff,* | No. 19 CV 4001 |
| v. | Judge Lindsay C. Jenkins |
| City of Chicago, *et al.,* | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kiontae Mack alleges that various Chicago Police Department ("CPD") officers violated his constitutional rights when they arrested and detained him without probable cause, coerced an involuntary confession from him, and fabricated evidence utilized in his prosecution for the 2012 robbery and murder of Stephin Williams. [Dkt. No. 133.] Mack was eventually acquitted but not before spending five years in pretrial detention. [*Id.*]

Defendants have filed a motion for summary judgment on all counts [Dkt. No. 145], and Mack has filed a cross-motion for summary judgment on Count One [Dkt. No. 147]. For the reasons discussed below, the Court grants Defendants' motion and denies Mack's cross-motion. A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Mack. Civil case terminated.

## I. Factual Background[1]

### A. The Crime and Initial Radio Dispatches

On August 24, 2012, Mack, then a seventeen-year-old high school student,[2] left his house late at night to go to a park located near 50th Street and Drexel Avenue. [Dkt. No. 176 at ¶ 1.] At approximately 2:15 a.m. on August 25th, Mack was sitting on the steps of the Operation PUSH building, located at 4955 South Drexel Avenue, with several others, including an individual referred to only as Rashad. [*Id.* ¶¶ 2–4.]

Shortly before 2:30 a.m. on August 25th, Stephin Williams and Breonna Clausell sat in a parked car near 49th Street and Drexel Avenue when two black men walked by. [Dkt. No. 163 at ¶¶ 1–2; Dkt. No. 176 at ¶¶ 4–5.] Williams was sitting in the driver seat and Clausell in the passenger seat. [Dkt. No. 163 at ¶ 2; Dkt. No. 176 at ¶ 6.] The two men who passed Williams's car circled back, walked to rear of the car and then stopped at the driver's side and passenger side window. [Dkt. No. 163 at ¶ 2; Dkt. No. 176 at ¶ 5.] The parties agree that Tucker was the person who stood at the driver's side window. [Dkt. No. 163 at ¶ 2; Dkt. No. 176 at ¶ 6.] A critical issue in this case is who approached the passenger side window, a matter on which the parties disagree. Defendants maintain that it was Mack [Dkt. No. 163 at ¶¶ 3–4], while Mack

---

[1] The following facts are undisputed, unless otherwise noted. As the Court confronts cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *See Med. Protective Co. of Fort Wayne, Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The parties dispute Mack's intelligent quotient at the time of the crime, but neither party makes any argument regarding Mack's intelligence in their briefing. [Dkt. No. 150, 165, 175.]

contends it was that Rashad, one of the other individuals who had been sitting nearby at the Operation PUSH steps. [Dkt. No. 176 at ¶¶ 4, 6, 8.][3] Operation PUSH was located approximately 80 yards (240 feet) from the location where Williams and Clausell were parked. [Dkt. No. 163 at ¶ 50.] Mack maintains that he remained on the steps and watched. [Dkt. No. 176 at ¶¶ 4, 6, 8.]

After the two individuals stopped at the vehicle's windows, Williams placed the car in reverse in an apparent attempt to leave. [Dkt. No. 163 at ¶ 4.] In response, Tucker raised his gun and instructed Williams to park the car and unlock the doors. [Id. ¶ 4.] Mack contends that because he was on the stairs of Operation PUSH, he did not see Tucker pull a gun or see where it came from. [Dkt. No. 176 at ¶ 8.] At that point, Tucker reached into the vehicle[4] and took Williams's wallet and cell phone. [Dkt. No. 163 at ¶ 4; Dkt. No. 176 at ¶ 6.] Whoever was on the passenger side took Clausell's purse and searched its contents. [Dkt. No. 163 at ¶ 4; Dkt. No. 176 at ¶ 6.] Williams attempted to fight off Tucker, exited the car, and ran down Drexel Boulevard towards 50th Street. [Dkt. No. 163 at ¶ 4; Dkt. No. 176 at ¶ 7.] Defendants maintain that as Williams fled, the man on the passenger side yelled, "[b]last his ass." [Dkt. No. 163 at ¶ 4.]

---

[3] The parties disagree about Clausell's ability to see and identify the man on the passenger side. Defendants maintain that Clausell could readily identify Mack, because she saw the man for approximately twenty seconds and had the benefit of the vehicle's headlights and the surrounding artificial light in the area. [Dkt. No. 163 at ¶¶ 2–3.] Mack maintains that Clausell could not see the man on the passenger side. [Dkt. No. 176 at ¶ 6.]

[4] The parties disagree on whether Tucker opened the door or not. *Compare* [Dkt. No. 163 at ¶ 4 (stating that Tucker opened Williams's driver side door)] *with* [Dkt. No. 176 at ¶ 6 (stating that Tucker "reached into the vehicle to pat down" Williams and "take his phone and wallet")].

Tucker repeatedly shot at Williams. [Dkt. No. 163 at ¶ 4; Dkt. No. 176 at ¶ 7.] Williams was struck and fell to the ground. [*Id.*] The individuals sitting on the Operation PUSH steps scattered at the sound of gunshots. [Dkt. No. 176 at ¶ 9.] Mack contends that after witnessing the shooting, he ran towards 49th Street, made a right turn, and then started walking down 49th Street alone. [Dkt. No. 176 at ¶ 13.] Defendants maintain that Mack and Tucker ran together in a northbound direction. [Dkt. No. 163 at ¶¶ 4, 12, 14.]

Clausell ran to Williams's body and called 911. [Dkt. No. 163 at ¶ 4.] CPD police officers Thomas Barnes and Michael Ray were the first to arrive to the scene at Drexel Avenue and 49th Street.[5] [*Id.* ¶ 5.] Ray called an ambulance and Barnes spoke with Clausell. [*Id.* ¶ 5.] Clausell told Barnes that two black men robbed her and shot Williams, including one lighter skinned man wearing a polo-type shirt. [*Id.* ¶ 6.] This information was broadcasted via CPD flash message. [*Id.*] Eventually, the two officers left the scene for Northwestern Hospital, where Williams later died from gunshot wounds. [*Id.* ¶ 7.] After Barnes returned to CPD's Area Central Detectives' Division, he consulted with other officers and wrote two police reports: an incident report ("Barnes Incident Report") and an arrest report ("Barnes Arrest Report").[6] [Dkt. Nos. 163 at ¶ 8; 164-1, 164-2.]

---

[5]    Ray has been dismissed as a defendant. [Dkt. No. 133.]

[6]    The parties dispute whether Barnes authored the Barnes Arrest Report. While the Arrest Report states that Barnes attested to this report, Barnes testified that he did not remember filling out the "narrative" portion of the report. [Dkt. No. 176 at ¶ 24.] As such, Mack argues that this report, including its notation that Clausell "tentatively identified" Mack, was "fabricated." [*Id.*] Defendants point to Barnes's later deposition testimony, where Barnes states that it was "common" for the officer assigned to the arrest to fill in preliminary

At about 2:30 a.m., University of Chicago Police Department ("UCPD") police officers Eric James and Randy Carter received a dispatch radio call of shots fired around 4900 South Drexel Boulevard, some three blocks from where they were then located. [Dkt. No. 163 at ¶ 10.] The two officers subsequently drove to the area, looking for potential witnesses, victims, or offenders. [*Id.* ¶ 11.]

The parties dispute what happened next. Defendants maintain that within approximately a minute of the dispatch call and while waiting to turn eastbound from Drexel Boulevard onto 49th Street, UCPD officers saw two men walking "right next to each other" westbound, approximately 30 feet away from them, towards their vehicle. [*Id.* ¶ 12.] As the UCPD officers turned right onto 49th Street from Drexel Boulevard, one of the individuals (later identified as Tucker) fled southbound via an alley. [*Id.* ¶¶ 12, 14.] This information was relayed via radio. [*Id.* ¶ 14.] The officers stopped the second man, who continued to walk westbound, by shouting, "Police, hey, want to talk to you." [*Id.* ¶ 15.] Mack admits that UCPD officers stopped him at approximately 2:30 a.m., but Mack contends that he was walking alone and not with Tucker. [*Id.* ¶¶ 12–16.]

According to Defendants, the two UCPD officers asked Mack whether he had heard any shots and what he was doing in the area; Mack responded that he did not hear anything and was out walking around. [*Id.* ¶ 17.] Mack denies telling the officers anything. [*Id.*] The parties agree that Mack cooperated with officers and was not

---

information and other officers to include additional information as the case was investigated. [Dkt. No. 146-26 at 18–19; Dkt. No. 176 at ¶ 24.] Barnes stated that there was nothing inappropriate about this. [Dkt. No. 146-26 at 19.]

carrying a gun, purse, cell phone, wallet, or any illegal contraband. [Dkt. No. 176 at ¶ 11–12.] During the stop, UCPD received updated information about the assailant, namely that he was a lighter complected black man wearing a light-colored polo-type shirt. According to Defendants, this matched the description of the person who was seen fleeing down the alley. [Dkt. No. 163 at ¶¶ 18–19.] Officers handcuffed Mack and placed him in a police car. [Dkt. No. 163 at ¶ 19; Dkt. No. 176 at ¶ 12.]

UCPD police officer Gordon Dameron arrived at 49th Street and Drexel Avenue.[7] [Dkt. No. 163 at ¶ 20.] In pursuit of the individual who fled, Dameron drove southbound down Ellis Avenue towards 50th Street. [*Id.* ¶¶ 21–22.] As he drove, Dameron observed a person who matched the white polo, lighter complected description, exit the mouth of an alley near 50th Street and Ellis.[8] [*Id.* ¶ 22.] Dameron exited his vehicle, ordered the individual to the ground, and radioed for backup. [*Id.* ¶ 24.] James and Carter drove to Dameron's location at approximately 2:32 a.m. and confirmed that the individual who Dameron had detained was the same person who

---

[7]     The parties dispute whether Mack was placed in the back of Dameron's vehicle or another UCPD police vehicle. *Compare* [Dkt. No. 163 at ¶ 21 (Defendants stating that Mack was placed in Dameron's vehicle)] *with* [Dkt. No. 163 at ¶ 21 (Mack stating that he was placed in James and Carter's vehicle); Dkt. No. 176 at ¶ 15 (same)]. Neither party demonstrates how the difference in transporting vehicle is relevant to any of Mack's claims. Regardless, both parties agree that Mack and later Tucker were transported back to the scene in separate police cars for a show-up. [Dkt. No. 163 at ¶ 30.]

[8]     The parties dispute what happened next. Defendants maintain that when Dameron observed the lighter complected black man wearing a lighter-colored polo-type shirt (later identified as Tucker), Mack spontaneously declared, "That's the guy that did it right there." [Dkt. No. 163 at ¶ 23.] Mack denies this, maintaining that he was not in the car with Dameron and therefore could not have made this statement. [*Id.*] The dispute is immaterial because neither party utilizes Mack's purported statement. [Dkt. Nos. 150, 165, 175.]

initially fled from them. [*Id.*] This person was later identified as Tucker and as the shooter. [*Id.* ¶ 35.]

### B.    The On-Scene Show-Up and Investigation

Within three minutes of the initial radio call, CPD Sergeant Terry Hoover arrived at the crime scene and spoke with Clausell. [*Id.* ¶¶ 25–27.] Clausell described the shooter as a lighter-complected black man wearing a white polo-type shirt. [*Id.* ¶ 27.] Clausell did not provide a description of the other man but stated that she would maybe be able to identify him if she saw him. [*Id.* ¶ 28.] Hoover, who by then had received information that UCPD had detained two suspects, decided to conduct an on-scene "show-up" and directed the UCPD officers to bring the two detained individuals to the scene. [*Id.* ¶¶ 26, 28–29.]

Within a few minutes, UCPD arrived in two separate cars. [*Id.* ¶ 29.] At approximately 2:43 a.m., Hoover conducted two show-ups. [*Id.* ¶ 30.] First, Hoover opened the back door of the car where Mack was seated, directed his flashlight in Mack's face, and asked Clausell if she recognized Mack as one of the two assailants. [*Id.*] Clausell was approximately six to eight feet away from Mack and the show-up itself lasted approximately five to ten seconds. [*Id.*]

Clausell's response is recounted in various reports and witness testimony. Mack says that Clausell stated that she was "not sure" if he was the other assailant. [Dkt. No. 163 at ¶ 32.] The police reports describe Clausell's response similarly, namely that she was "not sure," "could not positively identify" Mack, or was otherwise "tentative" in her identification of him as one of the assailants. [Dkt. No. 146-13 at 4

(UCPD incident report noting that Clausell "could not positively identify" Mack "as a suspect"); Dkt. No. 164-1 at 4 (Barnes Incident Report noting that Clausell "could not positively identify Kiontae Mack . . . as a suspect"); Dkt. No. 146-10 at 2 (Hoover's supplementary crime scene report noting that Clausell stated that Mack "might be the person who was with" the shooter); Dkt. No. 146-4 at 7 (Barnes Arrest Report noting that Clausell "tentatively identified" Mack); Dkt. No. 146-12 at 12 (Detective William Davis's crime scene report noting that Clausell "tentatively identified" Mack).

Generally speaking, these officers agreed on what constituted a tentative identification for the purpose of their reporting. [Dkt. No. 146-26 at 18 (Barnes's testimony that if a witness states that an arrestee "may not have done it" or that they were "not sure," it is a tentative identification); Dkt. No. 146-9 at 20, 23 (Hoover's testimony that if a "witness is not 100 percent sure either way" or "unsure," it is a tentative identification); Dkt. No. 146-5 at 12 (James's testimony that if a witness states that an arrestee "could be the person" but that they were "not sure," he would state that the "individual did not identify" the suspect); Dkt. No. 146-14 at 9 (Detective William Davis's testimony that if a witness states that the arrestee "could be the person that did [the crime]" but they are "not sure," it is a tentative identification).]

Next, Hoover conducted the show-up of Tucker using the same procedure. [Dkt. No. 163 at ¶ 35.] Clausell identified Tucker as the shooter in less than a minute, stating that she was "sure" that he was the shooter. [*Id.*] Hoover subsequently

authored a supplementary crime scene report ("Hoover Crime Scene Report") to memorialize these events. [*Id.* ¶ 36.]

Approximately one hour later, at 3:43 a.m., CPD Detective William Davis arrived at the crime scene, left for the Northwestern Hospital, and returned to the scene. [*Id.* ¶¶ 37–39.] In the early morning hours that same day, Davis interviewed Clausell, who indicated that she had already "identified" both Tucker and Mack as the assailants. [*Id.* ¶¶ 39–40; Dkt. No. 176 at ¶ 25; Dkt. No. 146-12 at 12.] Davis memorialized his investigation in a crime scene report ("Davis Crime Scene Report").[9] [Dkt. No. 163 at ¶ 40.]

### C. Mack's Interviews at the Police Station

Mack was subsequently transported to the Area Central Chicago Headquarters, located at 51st Street and Wentworth Avenue. [Dkt. No. 163 at ¶ 36; Dkt. No. 176 at ¶ 28.] Mack was placed in an interview room at approximately 3:44 a.m. [Dkt. No. 163 at ¶ 43.] At approximately 6:18 a.m., CPD Detective David Roberts provided Mack with his *Miranda* rights, which Mack waived. [*Id.* ¶ 46.] At 6:30 a.m., Roberts and CPD Detective Paul Maderer questioned Mack. [*Id.* ¶ 48.] The interview was recorded. [*Id.* ¶ 43.]

The interview lasted about 16 minutes, from approximately 6:30 to 6:46 a.m. [Dkt. No. 146-15 at 9–31.] During the first few minutes of questioning, Mack denied any involvement in the robbery or shooting, claiming that he was sitting on the

---

[9]     The parties agree that while Davis admitted that he took notes of his interview with Clausell, those notes are now missing. [Dkt. No. 176 at ¶ 26.]

Operation PUSH steps with others while Tucker and Rashad committed the robbery. [*Id.* ¶ 49; Dkt. No. 146-15 at 9–12, 16–17.] Roberts instructed Mack not to "bullshit" them because "we kinda know what happened," based on "what other people [were] telling [them]" and that they "knew" that Mack was "by the car." [Dkt. No. 163 at ¶ 51; Dkt. No. 146-15 at 10–11.] Roberts said that although he knew that Mack and Tucker "walked up to the car," Mack had to "take it from there" because he could not "put words in [Mack's] mouth." [Dkt. No. 163 at ¶ 51; Dkt. No. 146-15 at 13.] Roberts told Mack that he did not want Mack to "get fuckin' jacked up and spend fifty fuckin' years in prison," [Dkt. No. 163 at ¶ 51; Dkt. No. 146-15 at 13–14], a profanity-laced sentiment that he repeated six times during his interviews with Mack. [Dkt. No. 176 at ¶ 42.] After Mack recounted what happened that night, Roberts stated that he had a "problem" because Mack was "kind of on the right track" but Roberts knew that Mack "went up to the car with [Tucker]" and thus, Mack must have been lying. [Dkt. No. 146-15 at 16–17.] Mack repeatedly denied that that he was at the car or otherwise involved in the robbery and shooting. [Dkt. No. 163 at ¶ 51; Dkt. No. 146-15 at 11–12, 15, 17.] Mack offered to take a lie detector test. [Dkt. No. 146-15 at 19.]

Beginning at approximately 6:40 a.m. until the interview ended at 6:46 a.m., Mack confessed to the robbery that night. [Dkt. No. 163 at ¶¶ 52–57.] Mack said that Tucker and Mack walked to the car because the two were "supposed to do a robbery," he "guess[ed]." [Dkt. No. 146-15 at 21.] After Roberts prompted Mack, stating "[n]ow you walked up to the car," Mack said that he "just walked past the car" and then "walked back towards the car." [*Id.* at 21–22.] Mack said, "I guess they turned the car

on and then [Tucker] pulled the gun out." [*Id.* at 22, 29.] Mack said that Tucker was talking to the passengers, that Mack did not know what Tucker was saying, and that there were "three females" in the car. [*Id.* at 22.] Mack said that he "guess[ed] [that Tucker] asked them to get out of the car and told [Mack] to open the door." [*Id.* at 23.] Mack said that Tucker might have taken Clausell's purse. [*Id.* at 25–26, 30.] Mack finally said that the driver eventually exited the car to run, Tucker shot him, and Mack fled. [*Id.* at 24–25.]

At the end of the interrogation, Mack insisted that he never ran with Tucker at any time after the shooting, was never alongside Tucker in the minutes that followed the shooting, and never met up with him again until the show-up. [Dkt. No. 163 at ¶ 57.] Throughout Mack's interview, Roberts told Mack that Mack providing information "was not a that big of a deal" and that Roberts wanted "the right details." [Dkt. No. 176 at ¶ 44.] Roberts stated that he did not want to "screw" Mack because he was just a "kid." [*Id.* ¶ 44.]

At 7:21 a.m., Maderer gave Mack something to eat. [Dkt. No. 163 at ¶ 58.] From 7:22 to 7:25 a.m., Maderer challenged Mack on his claim that he was not with Tucker when UCPD stopped Mack, which Mack continued to deny. [*Id.* ¶ 59; Dkt. No. 146-15 at 31–36.] Mack made an equivocal claim to speak with an attorney, which he later retracted. [Dkt. No. 163 at ¶ 59.]

At 11:25 a.m., Assistant States Attorney Kevin Deboni ("Deboni") and Roberts entered the interview room, where Mack had fallen asleep. [Dkt. No. 163 at ¶ 60.] Deboni introduced himself, explained his role as prosecutor, and again provided Mack

his *Miranda* rights, which Mack again waived. [*Id.* ¶¶ 60–61.] From 11:25 to 11:45 a.m., Deboni interviewed Mack on that night's events. [*Id.* ¶ 64.] Mack said that earlier that night, he was sitting with some friends, including Tucker and Rashad, on the steps of Operation PUSH. [*Id.* ¶ 65.] Tucker asked if Mack and Rashad wanted to "go do a sting," which referred to a robbery. [*Id.* ¶ 66.] Mack initially said that Rashad walked up to Williams's car with Tucker, prompting Deboni to ask, "So, now you're saying that you didn't go up to the car?" [Dkt. No. 146-15 at 47.] Mack said that he went with Tucker up to Williams's car, which was parked near an elementary school. [*Id.* at 47–48.] Mack identified the car as an "MC," but could not identify how many doors it had or whether anyone was inside it. [Dkt. No. 163 at ¶¶ 64, 67; Dkt. No. 176 at ¶ 47.] Mack said that Tucker was on the driver's side, had a gun, and snatched Clausell's purse. [Dkt. No. 163 at ¶¶ 68–69.] Mack denied opening the passenger side door. [Dkt. No. 176 at ¶ 47.] When Tucker started shooting, Mack claimed he ran northbound toward 49th Street. [Dkt. No. 163 at ¶ 69.] Once again, Mack denied running with Tucker, stating he never saw Tucker again "until they put me in the car, and we rode past him." [*Id.* ¶ 70; Dkt. 146-15 at 56.]

### D.    Clausell's Interview at the Police Station

At some point on August 25th,[10] Roberts and Maderer interviewed Clausell at the police station. [Dkt. No. 163 at ¶ 73.] Roberts and Maderer showed Clausell two pictures, one of Tucker and one of Mack. [Dkt. No. 164 at ¶ 74; Dkt. No. 176 at ¶¶ 30,

---

[10]     Clausell testified at trial that she was interviewed around 9 a.m., while Detectives Roberts and Maderer recall speaking with Clausell around 3:30 or 4:00 a.m. [Dkt. No. 163 at ¶ 72.]

33.] Clausell testified at trial that she was shown the photos after she identified both Mack and Tucker. [Dkt. No. 163 at ¶ 76; Dkt. No. 146-1 at 97, 103–04, 118–19.] At his deposition, Roberts confirms this, testifying when he interviewed Clausell, Clausell said she already made "an identification" of both men at the on-scene show-up. [Dkt. No. 146-17 at 9–10, 14.] Maderer similarly testified at his deposition that Clausell told him and Roberts that she had identified both offenders at the scene. [Dkt. No. 146-21 at 75.] Maderer and Roberts thereafter authored a supplementary report ("Supplementary Report") to memorialize their findings. [Dkt. No. 176 at ¶ 27.] The report notes that Clausell told detectives that she "identified Kiontae Mack as one of the offenders who robber [sic] her and Stephin" at the show-up. [*Id.*]

In their depositions, Maderer and Roberts gave various reasons for showing Clausell single photos of Mack and Tucker while at the station. [*Id.* ¶¶ 34–35.] Maderer stated that he only showed a single photo (1) to confirm that "the demographics," meaning birthdate and IR number, of the arrestees "were correct," (2) to ensure "the name matched the person" the Detectives had in custody, and (3) "to determine if the people [Clausell] identified, what their information is, and, also, are these the two people you picked out." [*Id.* ¶¶ 34–36.] Roberts testified that he showed Clausell single photos "just a confirmation." [Dkt. Nos. 146-17 at 12; Dkt. No. 176 at ¶ 39.]

After the photo array, Deboni interviewed Clausell with Roberts present. [Dkt. No. 163 at ¶ 77.] At his deposition, Roberts testified that Clausell identified Mack as one of the assailants during this interview. [*Id.*]

13

### E. Mack's Criminal Trial

Shortly after 12 p.m. on August 25, 2012, Deboni approved murder and robbery charges against Tucker and Mack. [Dkt. No. 163 at ¶ 78.] In September of 2012, a grand jury indicted Mack and Tucker on first degree murder charges. [*Id.*; Dkt. No. 146-18.] Five years later, in June of 2017, Mack and Tucker were tried simultaneously by separate juries. [Dkt. No. 163 at ¶ 79.] The State did not reference or enter into evidence Mack's confessions. [*Id.* ¶ 84.] At trial, Clausell identified Mack as the assailant on the passenger side of Williams's car. [*Id.* ¶ 85.] Clausell testified that she "was able to identify" Mack at the show-up as one of the two assailants, after she "asked for a better look," based on recognizing his hair, clothing, and the portion of his face that was visible. [*Id.* ¶ 33.] Mack did not testify and presented no alibi witnesses. [*Id.* ¶ 87.] The first jury convicted Tucker, and the second jury acquitted Mack. [*Id.* ¶ 88.] By then, Mack had been detained just shy of five years. [*Id.*]

## II. Procedural Background

After his release from pretrial detention in 2017, Mack filed the present lawsuit. [Dkt. No. 1.] In his Third Amended Complaint ("TAC"), Mack raises claims against several individual officers to include Davis, Maderer, Roberts, Hoover, and Barnes ("Individual Defendants"). [Dkt. No. 79, 80, 133.] Mack alleges: (1) a wrongful pretrial detention claim against the Individual Defendants (Count One); (2) an evidence fabrication claim under the Fourteenth Amendment against the Individual Defendants (Count Two); (3) a coerced confession claim in violation of the Fifth and Fourteenth Amendments against Maderer and Roberts (Count Three); (4) a

conspiracy claim against Individual Defendants (Count Four); (5) a failure to intervene claim against the Individual Defendants (Count Five); (6) a malicious prosecution claim against Davis, Maderer, and Roberts (Count Six), and (7) a claim for indemnification against the City of Chicago (Count Seven). [Dkt. No. 133 at ¶¶ 89–126.] The parties have filed cross motions for summary judgment, which the Court now resolves. [Dkt. Nos. 145, 147.]

## III.    Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). As the Court confronts cross-motions for summary judgment, the Court views the facts in the light most favorable to party against whom the motion under consideration is made. *See Med. Protective Co. of Fort Wayne v., Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). The Court may not weigh conflicting evidence or make credibility determinations. *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [his] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether

15

a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## IV. Analysis

### A. Count One: Unlawful Pretrial Detention under the Fourth Amendment

Defendants seek summary judgment on Mack's claim for wrongful pretrial detention, Count One. [Dkt. No. 150 at 7–12; Dkt. No. 175 at 1–10.] Defendants argue that the Individual Defendants had sufficient probable cause to arrest and detain Mack, and, in the alternative, officers Hoover, Davis, Maderer, and Roberts are entitled to qualified immunity. [*Id.*] In his cross-motion, Mack seeks summary judgment on his wrongful pretrial detention claim, arguing that officers lacked probable cause to detain him. [Dkt. No. 149 at 8–11.]

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure, including pretrial detention, is reasonable only if it was based on probable cause to believe the detainee had committed a crime. *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019). The Fourth Amendment governs both detentions that happen before and after the legal process begins. *See Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 366–67 (2017); *see also Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021). Unlawful pretrial detention occurs when either "the police hold someone without any reason before the formal onset of a criminal proceeding," or when "legal process itself goes wrong—when, for example, a judge's probable-cause

16

determination is predicated solely on a police officer's false statements." *Manuel*, 580 U.S. at 367.

Probable cause constitutes "an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). Probable cause exists "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person" to believe "that the suspect had committed or was committing an offense." *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (quoting *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004)); *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citations omitted) (noting that courts "must keep in mind that probable cause is a common-sense inquiry requiring only a probability of criminal activity"). Whether an arrest is supported by probable cause is usually a question of fact decided by the jury. *Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706, 714 (7th Cir. 2013). However, if the underlying facts are undisputed, the Court can make that decision on summary judgment. *Id.*

1. *Hoover*

Defendants argue that "probable cause existed to detain Mack for his show-up," and that Hoover had sufficient probable cause to detain him thereafter. [Dkt. No. 150 at 13-14.] Conversely, Mack argues that "up to the point that Mack was transported to be in the show up, there were no facts giving rise to probable cause," and that once Clausell "could not positively identify Mack" at the show-up, Hoover

17

lacked probable cause to detain him further. [Dkt. No. 149 at 9–10.] Because the probable cause assessment rests on facts relayed to Hoover by UCPD officers, the Court begins with the information known to UCPD under the collective knowledge doctrine. *See United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quoting *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005)) ("[P]olice who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency.").

UCPD officers James and Carter initially arrested Mack and transported him to the scene for the show up. There is no dispute that these officers made an arrest: Mack was handcuffed, placed in a police car, and transported back to the scene at Hoover's direction. *Mwangangi v. Nielsen*, 48 F.4th 816, 826 (7th Cir. 2022) (quoting *United States v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989)) (observing that the "use of handcuffs substantially aggravates the intrusiveness of a *Terry* stop and, as a meaningful restraint on freedom of movement, is normally associated with arrest").

But there was no probable cause to arrest Mack, and no reasonable jury could find otherwise. For one, at the time they encountered Mack, UCPD officers had few, if any, details relating to the shooting incident itself, the suspects or the number of suspects, or the direction of flight. [Dkt. No. 163 at ¶¶ 14–18.] After receiving the "shots fired" dispatch call over the radio, UCPD officers relocated to the intersection of 49th and Drexel to "look for a witness, a victim, or possible offenders." [*Id.* ¶ 11.] According to Defendants, UCPD officers observed two men who were walking

together in a westbound direction, and one of the males (Tucker) fled southbound via an alley. [*Id.* ¶¶ 10–14.] There was no one else in the area at the time. [*Id.* at ¶ 16.]

Without specific details, the information at UCPD's disposal did not add up to a reasonable belief that Mack had committed a crime. True, Mack had geographical proximity to the crime scene, but closeness does not necessarily transfer suspicion. *See United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012) ("A mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property."); *see, e.g.*, *United States v. Ingrao*, 897 F.2d 860, 866 (7th 1990) (finding no probable cause when defendant was arrested "principally because he carried a bag down a gangway previously used in a suspicious transaction and furtively looked around"). For all they knew, Mack could have been "someone merely walking down the street," albeit at an odd hour of the day. *Ingrao*, 897 F.2d at 864.

That Mack *may* have been walking with Tucker also wasn't enough. [Dkt. No. 150 at 9.] Probable cause based on association with someone engaging in criminal activity requires some additional circumstances "from which it is reasonable to infer participation in criminal enterprise." *Ingrao*, 897 F.2d at 864. "Mere propinquity to others independently suspected of criminal activity," like Tucker, won't do. *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979); *see also United States v. Richards*, 719 F.3d 746, 757 (7th Cir. 2013).

Mack's behavior during the encounter also does not support a finding of probable cause. All agree that Mack was cooperative and that he did not flee. [Dkt. No. 163 at ¶ 15; Dkt. No. 176 at ¶¶ 11–12.] Defendants say that Mack responded to

UCPD officers' questions (though Mack denies saying anything at all). [Dkt. No. 163 at ¶ 17.] Nor was Mack carrying a gun, purse, cell phone, wallet, or any illegal contraband. [Dkt. No. 176 at ¶ 11]; *compare United States v. Lima*, 819 F.2d 687, 689 (7th Cir. 1987) (noting that "flight can be strong evidence of guilt").

Before Mack was handcuffed and placed in the police car, one additional fact came to light: UCPD officers received updated information that the assailant was a lighter complected black man wearing a light-colored polo-type shirt. [Dkt. No. 163 at ¶¶ 18–19.] According to Defendants, UCPD officers believed this "matched the description of the person who fled down the alley moments earlier," and given "Mack's proximity to the shooting scene," and his location "northbound of the scene," UCPD placed Mack under arrest. [*Id.*]

This additional information does not tip the scale. The offender description information surely added to the weight of probable cause as to Tucker because he matched the given description. But not as to Mack. The record is not entirely clear whether UCPD was even informed that there was more than one assailant.[11] Even if this detail were clear, the updated information relayed to UCPD officers was that the offender was wearing a white polo-style shirt and was lighter complected, which fit Tucker's description. Nothing about this information was consistent with Mack. Under Defendants' telling, at the time he was handcuffed, all UCPD officers knew

---

[11]    UCPD Officer James' deposition testimony does not suggest that UCPD was advised that more than one assailant was involved in the "shots fired" incident relayed over the first flash call. [Dkt. No. 146-5 at 6-7.] James testified that, aside from location, no information other than "shots fired" was relayed to him.

was that Mack was near a person who they later learned fit the description of the alleged assailant. This alone was not enough.

At bottom, UCPD "knew very little at the moment" Mack was placed in handcuffs. *Mwangangi*, 48 F.4th at 827. Shots were fired in the immediate area, but the person described to UCPD did not match Mack's description. Nor did the first few minutes of firsthand observations with Mack add much to the already limited information. The evidence was insufficient to constitute probable cause to detain and arrest Mack and transport him to the show-up. [12]

Defendants argue that Hoover had several additional facts justifying Mack's continued detention. [Dkt. No. 150 at 13–14.] For one, during the show-up, Clausell stated that Mack "might be" the second assailant. [13] [*Id.*] Defendants also highlight that Hoover knew that UCPD officers had seen Mack and Tucker together minutes earlier at about 2:30 a.m.; knew that Tucker, who matched the description Clausell provided, fled upon seeing UCPD; and that Hoover was present when Clausell positively identified Tucker as the shooter during the show-up. [*Id.*]

---

[12] Mack argues that there is a genuine issue of material fact as to whether he was, in fact, walking with Tucker when UCPD first observed him. [Dkt. No. 165 at 12.] This dispute is not material. Given the Court's conclusion that UCPD did not have probable cause to arrest Mack during the initial encounter even if Mack and Tucker had been together, Mack walking alone would provide even less of a basis to conclude there was probable cause.

[13] Mack argues that there is a genuine issue of material fact regarding Clausell's response to Mack's show-up. [Dkt. No. 165 at 17 ("Finally, fact vii is substantially disputed since the weight of the evidence is that Clausell did not identify Plaintiff at the show up.").] The Court disagrees. There is no dispute that Hoover's report states that Clausell indicated that Mack "might be" the assailant and that Mack testified that Clausell said she was "not sure." [Dkt. No. 163 at ¶¶ 31–32.] Both accounts are seemingly in accord: Clausell was unsure and she did not positively or negatively identify Mack.

Although a closer question, the Court is not persuaded that these additional facts give rise to probable cause. Like UCPD, Hoover's information *about Mack* was quite limited. Much of what Hoover relied upon to support probable cause is no different than what UCPD relied upon: Mack's geographical proximity to the crime scene and his apparent association with someone engaging in criminal activity, which, as discussed, are not enough. After the show-up, Hoover knew that Mack "might be" the second assailant and that Tucker had been positively identified. While this development was certainly sufficient to establish probable cause as to Tucker, it was insufficient to support a reasonable belief that Mack "had committed or was committing an offense."[14] *Camm*, 937 F.3d at 1105. (And if, as Mack insists, he was walking alone, this would provide even less evidence of a basis for probable cause).

Even so, Hoover is entitled to qualified immunity because he had *arguable* probable cause. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted); *see also Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). In evaluating qualified immunity, the Court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that

---

[14] Mack argues that Clausell's identification is even less reliable considering Supreme Court caselaw, *Neil v. Biggers*, 409 U.S. 188 (1972). [Dkt. No. 165 at 13.] While not dispositive to the Court's conclusions, *Biggers* does not support Mack's position directly, as it "concern[s] the admissibility of evidence at criminal trials, not claims for damages against arresting officers." *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) (refusing to extend the "*Biggers* approach . . . from trials to arrests").

constitutional right was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232.

The Seventh Circuit has recognized that an officer who lacks probable cause to arrest is still entitled to qualified immunity if "a reasonable officer could have mistakenly believed that probable cause existed." *Fleming v. Livingston County*, 674 F.3d 874, 878 (7th Cir. 2012) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). The "arguable-probable cause inquiry is separate from the probable-cause inquiry"; "whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right." *Abbott*, 705 F.3d at 715 (internal citations omitted). Arguable probable cause constitutes a bar to liability for unlawful pretrial detention claims. *Lewis*, 914 F.3d at 477.

A reasonable officer in Hoover's position could have mistakenly believed that probable cause existed. *Fleming*, 674 F.3d at 878. Given the disparate pieces of information Hoover had put together, he could reasonably believe that he had probable cause to arrest Mack, since even a tentative identification can establish probable cause. *McDaniel v. Polley*, 847 F.3d 887, 895 n.5 (7th Cir. 2017) (noting that a single witness's tentative identification from a photo array can establish probable cause);[15] *see also Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022)

---

[15]     Mack's attempts to distinguish *McDaniel* are unpersuasive. [Dkt. No. 165 at 19.] His brief emphasizes that *McDaniel* involved a habeas petition and a photo array, and involved an eyewitness who said a photo "looked like" the perpetrator. This, Mack says, is different from the instant case, which involves an eyewitness who said she was "unsure." [Dkt. No. 163 at ¶ 32.]. From the Court's perspective, the point is that *McDaniel*, like this

(holding that officers had probable cause to arrest defendant when he matched physical description of attacker, had been cited for prowling in area of recent home invasions, had prior convictions that resembled present crime, and was tentatively identified); *Fleming*, 674 F.3d at 880 (concluding that defendant officer had arguable probable cause to arrest plaintiff when he was the only person in the area, was seen a block away from the crime, and matched the description of the intruder).

Simultaneously, Mack fails to uphold his burden regarding qualified immunity. To defeat qualified immunity, Mack must demonstrate that the right which the defendants allegedly violated was clearly established at the time of their conduct. *See Finkley*, 10 F.4th at 737 (quoting *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)) ("[O]nce the defense [of qualified immunity] is raised, it becomes the plaintiff's burden to defeat it."). To do so, Mack must either "identify[] a closely analogous case" or "persuad[e] the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24; *see also Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000) (holding that a plaintiff need not identify a closely analogous case if he can establish "that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue").

---

case, concluded that even a tentative identification by a witness was sufficient to establish probable cause, absent a reason to doubt that the witness was telling the truth. 847 F.3d at 895 n.5.

To meet this burden, Mack cites *Driebel v. City of Milwaukee*, for the general proposition that the Fourth Amendment has long established a right to be free from arrest without probable case. 298 F.3d 622, 652 (7th Cir. 2002). This is true, but not sufficient. An "impermissibly high level of generality for qualified immunity purposes" is insufficient to meet the burden. *Jump v. Village of Shorewood*, 42 F.4th 782, 792 (7th Cir. 2022); *Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015) ("It is not enough to simply assert that it was clearly established law that officers need probable cause to arrest a person"). Mack cites to *Driebel* for this proposition only and nothing more. [Dkt. No. 165 at 26.]

To prove that a right is clearly established with a closely analogous precedent, Mack must show that the law was clear "in relation to the specific facts confronting the public official when he acted." *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013)). Mack's brief makes *no* argument in this regard, and the Court's own review of the facts in *Driebel* reveal they are far afield from this case. [Dkt. No. 165 at 26–27]; *see Driebel*, 298 F.3d at 638–41 (determining that defendant officers lacked probable cause to detain another police officer who refused to obey a command to remain on duty or report to a particular location to answer questions). Nor does Mack show that the violation was "so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw*, 235 F.3d at 1022. While Hoover made a mistake in believing that he had probable cause to detain Mack, qualified immunity "tolerates reasonable mistakes regarding probable cause." *Whitlock*, 596 F.3d at 413. And Hoover's mistake was not "so egregious and

unreasonable that . . . no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 724. As such, Hoover is entitled to qualified immunity.

### 2. *The Remaining Individual Defendants*

As for Davis, Roberts, and Maderer, no reasonable jury could find that they lacked probable cause to detain Mack. Unlike Hoover, Davis, Roberts, and Maderer had additional information that Hoover did not: during her interviews at the police station, Clausell told Davis and later Roberts and Maderer that she had already identified Mack at the show-up. [Dkt. No. 163 at ¶¶ 39–40, 73.] All three memorialized this information in their subsequent reports. [*Id.* ¶¶ 40, 73.] Clausell confirmed as much at trial, testifying that "she viewed the single photographs of Tucker and Mack only after she had already previously identified them as the two assailants." [*Id.* ¶ 76.] Roberts and Maderer also interviewed Mack, who made incriminating statements about his involvement. [Dkt. No. 146-15 at 9–31.] While Mack resists this conclusion, these developments were sufficient to establish probable cause. *See, e.g.*, *Phillips v. Allen*, 668 F.3d 912, 914–15 (7th Cir. 2012) (collecting single eyewitness identification cases).

Mack makes two other arguments as to the Individual Defendants: (1) that Barnes Arrest Report, like the other police reports in this case, fabricated Clausell's identification of Mack; and (2) that Roberts and Maderer's use of a single photo of Mack and Tucker was unduly suggestive, thereby "fabricating" or tainting Clausell's identification of Mack. [Dkt. No. 165 at 17–21, 26.] To some degree these arguments overlap with other claims raised in the TAC discussed below, but the Court addresses

them here in light of their relevance to the question of probable cause to continue Mack's detention.

"[L]aw enforcement officers may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Coleman v. City of Peoria, Ill.,* 925 F.3d 336, 347 (7th Cir. 2019) (internal quotation marks omitted) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). To show evidence fabrication, Mack must prove not only that Clausell's statement contained within Individual Defendants' reports was false but that Individual Defendants "manufacture[d]" it. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). That requires proof that the Individual Defendants caused Clausell to provide them with a statement that they knew—with certainty—was false. *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (holding that investigators fabricate evidence when they tell "witnesses what to say knowing that what the team [is] telling them [is] false"). This is admittedly a "high bar to clear." *Coleman*, 925 F.3d at 344.

As to Mack's first argument that the police reports in this case were fabricated, Mack fails to demonstrate such certainty, relying only on speculative inferences unmoored from the record. The Barnes Arrest Report, which is the central focus of Mack's argument, is entirely consistent with the other reports in this case.[16] These reports all indicate that Clausell was initially unsure of her identification, as reflected by statements that she was "not sure" if Mack was the assailant or that she

---

[16]    Barnes is named as a Defendant in Mack's unlawful pretrial detention claim, but his involvement in Mack's arrest is limited to the incident and arrest report he wrote after Mack's show-up. [Dkt. No. 163 at ¶¶ 5–9.]

could not "positively identify" and instead "tentatively" identified him.[17] [Dkt. No. 146-13 at 4 (Clausell "could not positively identify Mack"; Dkt. No. 164-1 at 4 (same); Dkt. No. 146-10 at 3 (Mack "might be the person who was with" Tucker); Dkt. No. 146-4 at 7 (Barnes's report that Mack "tentatively identified"); Dkt. No. 146-12 at 12 (same).] It is not reasonable to infer that Barnes falsified his report given that all the other reports conveyed a similar degree of uncertainty on the part of Clausell during the show-up. Nor would evidence of coaxing a "reluctant witness" suffice to show fabricated testimony. *Fields*, 740 F.3d at 1110. Fabricated testimony is testimony that is "made up; it is invariably false." *Id.*; *Coleman*, 925 F.3d at 346 ("Coerced testimony is not necessarily fabricated.").

Contrary to Mack's suggestion, the fact that the police reports did not use identical language is not *per se* evidence of fabrication. [Dkt. No. 165 at 11–13, 20–21.] The Court can discern no meaningful difference between a description that Clausell was "not sure" the assailant was Mack; that Mack "might be" the assailant; and that she "tentatively" identified Mack. *Compare* [Dkt. No. 146-13 at 4; Dkt. No. 164-1 at 4; Dkt. No. 146-10 at 2]; *with* [Dkt. No. 146-4 at 7; Dkt. No. 146-12 at 12]. If there is a difference, Mack has not identified it, nor does he explain how these descriptions signal a change in Clausell's identification.

---

[17] The officers deposed in this case testified that if a witness is not entirely sure of an identification, that information is denoted in a report by summarizing the witness's language, noting that the witness could not identify the suspect, or by indicating the witness made a tentative identification. [Dkt. No. 146-26 at 18; Dkt. No. 146-9 at 20, 23; Dkt. No. 146-14 at 9.]

Nor is there any basis on which to conclude that Clausell's identification of Mack in her interviews with Davis, Roberts, and Maderer was manufactured. Mack points out that the qualifier "tentatively" was "dropped" in the Davis Crime Scene Report and the Supplementary Report authored by Roberts and Maderer. From this, Mack concludes that these officers must have fabricated Clausell's testimony. [Dkt. No. 165 at 11, 20–22.] His argument amounts to nothing more than speculation. *See Carmody v. Bd. Of Tr. Of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (holding that "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"). It is also belied by Clausell's trial testimony that she identified Mack in both these interviews. [Dkt. No. 163 at ¶¶ 39–40, 73.] Mack fails to identify any evidence that contradicts this testimony, and he does not meet the "high bar" to show that the Individuals Defendants knew with certainty that they were manufacturing false evidence. *See Coleman*, 925 F.3d at 344.

Mack also contends that Defendants Roberts and Maderer lacked probable cause to detain Mack because they showed Clausell single photos of Mack and Tucker, which Mack characterizes as an unduly suggestive procedure designed to manipulate Clausell's identification. [Dkt. No. 165 at 19–21.] While the Constitution does not mandate that photo arrays meet a certain standard of quality to be per se lawful, the "Due Process Clause requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are so egregious as to taint the entire trial." *Coleman*, 925 F.3d at 347. Even so, these principles apply to the admissibility of eyewitness testimony, not § 1983 liability; Mack must still demonstrate that

Defendants lacked probable cause. *Id.* at 347, 351. Even assuming that officers subjectively doubted a witness's identification, it is generally for the judge and jury to weigh the evidence. *Id.* at 351. Questionable identifications can still provide probable cause. *Id.* at 351; *see also Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (noting that defendants had sufficient probable cause to arrest plaintiff, despite the eyewitness's hesitancy and inconsistencies with prior descriptions).

Clausell testified that by the time Roberts and Maderer showed her photos of Mack and Tucker, she stated she had already identified them as the assailants. [Dkt. No. 163 at ¶¶ 39–40, 73.] Mack does not identify any contradictory record evidence on this point. Rather, he admittedly makes "credibility" arguments and concludes on this basis that as between Roberts and Maderer, "somebody" or "both" are "lying." [Dkt. No. 165 at 19.] But credibility arguments are patently insufficient to avert summary judgment. *See Waldon v. Wal-Mart Stores, Inc., Store No. 1655*, 943 F.3d 818, 823 (7th Cir. 2019) (observing that "[c]riticizing the credibility of the movant's affiants, alone, is not enough to avoid summary judgment"); *see also Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (emphasis in original) ("[W]hen challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper."). And Mack cannot rely on his own conjecture or speculation to create a dispute. *See Carmody*, 893 F.3d at 401. For the same reason, Mack's argument that the officers' apparent failure to include his photo in their report

or that Davis's now missing notes create an "obvious inference . . . that they were hiding it," similarly fails.[18] [Dkt. No. 165 at 19, 24.]

The Court grants Defendants' summary judgment motion on Mack's unlawful detention claim and accordingly dismisses Count One. Mack's summary judgment motion is denied.

### B.     Count Two: Due Process under the Fourteenth Amendment

Defendants move for summary judgment on Mack's due process claim under the Fourteenth Amendment for alleged evidence fabrication, Count Two. [Dkt. No. 150 at 12–13; Dkt. No. 175 at 10–12.] The Seventh Circuit has recently refined the contours of its evidence fabrication caselaw. *See Patrick v. City of Chicago*, 974 F.3d 824, 834–35 (7th Cir. 2020) ("*Patrick II*"). A claim for false arrest or pretrial detention based on fabricated evidence "sounds in the Fourth Amendment right to be free from seizure without probable cause," per *Lewis*. *Id.* at 834. However, "[i]f fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial." *Id.* The fabricated evidence, if used at trial, might additionally "violate the accused's right to due process under the rubric of *Brady*." *Id.* at 834–35.

---

[18]     Mack's citation to *Williams v. City of Chicago* is similarly unavailing. 733 F.3d 749 (7th Cir. 2013). In *Williams*, in the context of malice in a malicious prosecution claim, the parties disputed a material fact: whether officers smelled gasoline on the defendant. *Id.* at 760–61. This fact was not in the officers' report filed at the time of the crime and "surfaced for the first time in the officers' depositions" in the suit. *Id.* at 761. This is far afield from the facts of the present case, where officers repeatedly documented that Clausell's identification in their interview reports. [Dkt. No. 163 at ¶¶ 27, 40.]

Here, Count Two raises a denial of due process claim under the Fourteenth Amendment that falls into the latter category. [Dkt. No. 133 at ¶¶ 89–99.] Mack makes no argument regarding the withholding of exculpatory evidence under *Brady*. [Dkt. No. 165.] A Fourteenth Amendment evidence fabrication claim has four elements: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result. *See Patrick II*, 974 F.3d at 834–35. This claim fails for a few reasons.

First, Mack was acquitted. As a result, he was not "damaged" by the admission of any evidence. Under controlling Seventh Circuit caselaw, wrongful pretrial detention claims brought under the Fourteenth Amendment fail when the defendant is acquitted at trial and fails to allege any post-trial deprivation of liberty. [Dkt. No. 79 at 5]; *Lewis*, 914 F.3d at 478 (recognizing that "a § 1983 claim for unlawful pretrial detention rests exclusively on the Fourth Amendment").

Since then, the Court in *Patrick II* further clarified that "[t]he essence of a due-process evidence-fabrication claim is that the accused was *convicted and imprisoned* based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick II*, 974 F.3d at 835 (emphasis added); *see also Camm*, 937 F.3d at 1105 (noting the complaint "cited both the Fourth and Fourteenth Amendments, but properly construed, the malicious-prosecution claim is really one for wrongful arrest and detention in violation of the Fourth Amendment"); *Kuri*, 990 F.3d at 575 ("If the detention is not supported by probable

32

cause, however, the Fourth Amendment provides a remedy"); *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) (citing *Lewis*, 914 F.3d at 475) ("[T]he Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention").

This result should come as no surprise. The Court previously addressed this very issue at the motion to dismiss stage, noting that courts within this district have consistently "dismissed wrongful pretrial detention claims brought under the Fourteenth Amendment's Due Process Clause by persons like Mack, who were acquitted at trial and did not allege any post-trial deprivation of liberty." [Dkt. No. 79 at 5 (citing *Henderson v. Rangel*, No. 18 C 6380, 2020 WL 5642943 (N.D. Ill. Sept. 21, 2020); *Young v. City of Chicago*, 425 F. Supp. 3d 1026, 1033–34 (N.D. Ill. 2019); *Moorer v. Platt*, No. 18 CV 3796, 2020 WL 814924, at *2 (N.D. Ill. Feb. 19, 2020); *Hallom v. City of Chicago*, No. 18 C 4856, 2019 WL 1762912, at *2 (N.D. Ill. Apr. 22, 2019)).] Since then, courts have continued to interpret *Lewis* to bar Fourteenth Amendment claims based on acquittals. *See, e.g.*, *Stubbs v. City of Chicago*, 616 F. Supp. 3d 793, 801 (N.D. Ill. 2022); *Liggins v. City of Chicago*, No. 1:20-CV-04085, 2021 WL 2894167, at *4 (N.D. Ill. July 9, 2021); *Cruz v. City of Chicago*, No. 20-CV-250, 2021 WL 2645558, at *10 (N.D. Ill. June 28, 2021); *Grayer v. City of Chicago*, No. 20-CV-00157, 2021 WL 2433661, at *3 (N.D. Ill. June 15, 2021); *Anderson v. Allen*, No. 1:19-CV-02311, 2020 WL 5891406, at *2 (N.D. Ill. Oct. 5, 2020). Curiously, Mack filed his TAC after *Patrick II* and after the Court's ruling on the motion to dismiss,

persisting in his claim under the Fourteen Amendment. [Dkt. No. 133 at ¶¶ 94–99.] But an acquittal dooms this claim.

Mack's claim additionally fails to meet other elements of a Fourteenth Amendment evidence fabrication claim. As the Court already concluded, Mack cannot show that Barnes, Davis, Roberts, or Maderer knowingly fabricated evidence against him or otherwise influenced Clausell's trial testimony. *See Carmody*, 893 F.3d at 401. Mack's fabrication claim as it applies to the police reports fares no better. None of the reports were introduced or used to refresh recollection during Mack's criminal trial and therefore none were "used" at a criminal trial. *Compare Brown v. City of Chicago*, 2022 WL 4602714, at *23 (N.D. Ill. Sept. 30, 2022) (concluding that a former pretrial detainee's fabrication of evidence claim based on supplementary police reports failed because none were used against defendant at trial); *with Avery*, 847 F.3d at 442 (ruling in favor of the plaintiff on an evidence fabrication claim when false police reports stating plaintiff confessed to the crime were admitted at trial). Based on the trial record before this Court, there is no evidence to the contrary. *See generally* [Dkt. Nos. 163, 176]. The Court accordingly grants Defendants' motion for summary judgment and dismisses Count Two.

### C.    Count Three: Coerced Confession under the Fifth and Fourteenth Amendments

Defendants additionally seek summary judgment on Mack's Fifth and Fourteenth Amendment claims against Detectives Maderer and Roberts for coercing his confession, Count Three. [Dkt. No. 150 at 13–17; Dkt. No. 175 at 12–17.] The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, prohibits

the use of "involuntary" or coerced confessions in criminal cases. *Chavez v. Martinez*, 538 U.S. 760, 770–71 (2003); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1023–24 (7th Cir. 2006). To bring a successful Fifth Amendment claim, Mack must show (1) that his confession was involuntary and coerced, and (2) that his confession was used against him in a criminal case. *Chavez*, 538 U.S. at 770–71.

To determine whether Mack's confession was involuntary, the Court must look at the totality of the circumstances and determine whether Mack's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante,* 499 U.S. 279, 288 (1991); *Alexander v. DeAngelo*, 329 F.3d 912, 918 (7th Cir. 2003) (quoting *United States v. Ceballos*, 302 F.3d 679, 695 (7th Cir. 2002)) (noting that police officers may "actively mislead" a defendant to obtain a confession, "so long as rational decision remains possible"). The Court analyzes coercion from the perspective of a reasonable person in the position of the suspect. *Hicks v. Hepp*, 871 F.3d 513, 527 (7th Cir. 2017). Relevant considerations include the suspect's age, intelligence, and mental state; whether there was a friendly adult present in the case of juveniles; the length of the detention; the nature of the interrogation; whether the suspect received *Miranda* warnings; whether physical coercion occurred; and the deprivation of food or sleep. *Id.*; *A.M. v. Butler*, 360 F.3d 787, 799 (7th Cir. 2004). If an arrestee is a minor at the time of questioning, the Court must conduct "a searching review of the facts." *Hardaway v. Young*, 302 F.3d 757, 766 (7th Cir. 2002).

For Mack to show that his confession was used against him in a criminal case, he must show that his confession was either used at his criminal trial, *see Chavez*,

538 U.S. at 770–71, or at a pre-trial hearing, s*ee Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018) ("The government violates the Self-Incrimination Clause by using coerced confessions at pre-trial hearings . . . in criminal cases."). Because the parties agree that the confession was not used at his criminal trial, [Dkt. No. 163 at ¶ 84], Mack's claim that his confession was coerced depends on the state utilizing it during a pre-trial hearing, *see Jackson*, 888 F.3d at 265.

It is unclear if Mack's confession or its contents was ever introduced at any pretrial hearing. Mack argues that his confession "was used to help indict and prosecute [him] and used to deprive him of his liberty." [Dkt. No. 165 at 21–22.] But he cites only to two cases, neither of which concern a coerced confession claim. *See Fields*, 740 F.3d at 1109 (analyzing evidence fabrication, malicious prosecution, intentional infliction of emotional dress, and conspiracy claims); *Collier v. City of Chicago*, No. 14 C 2157, 2015 WL 5081408, at *7–11 (N.D. Ill. Aug. 26, 2015) (analyzing false arrest, fabrication and withholding of evidence, malicious prosecution, civil conspiracy, and intentional infliction of emotional distress claims). Even if these cases were helpful to the Court's analysis, Mack fails to identify any judicial proceeding where his confession was actually used. *See generally* [Dkt. Nos. 146, 163, 164, 176]. For this reason, the claim fails.

Read liberally, Mack implies that he only needs to show that his allegedly coerced confession was used to initiate criminal proceedings, without identifying a pretrial hearing where the confession was actually used. [Dkt. No. 165 at 21–22.] Even if this argument were sufficiently developed for the Court to properly consider

it, and it is not, the argument is simply wrong. The *Sornberger* Court held that the plaintiff's unwarned statements were used against her in her criminal cause, thus violating the Fifth Amendment, specifically because they were introduced "at a probable cause hearing, a bail hearing and an arraignment proceeding." *Sornberger*, 434 F.3d at 1027. The Court distinguished an out-of-circuit case, where the Fourth Circuit held that the issuance of a summons was not a "courtroom use of a criminal defendant's compelled, self-incriminating testimony" and therefore not a Fifth Amendment violation. *Id.* (citing *Burrell v. Virginia*, 395 F.3d 508, 513 (4th Cir. 2005)). The *Sornberger* Court contrasted "the mere issuance of a summons" in *Burrell*, to the failure to administer warnings, which "led to three distinct 'courtroom uses' of her un-warned statement." *Id.* Put plainly, *Sornberger* teaches that it is not enough to say that a confession is coerced or precedes a criminal trial; the plaintiff must point to an actual use of it to make out a civil rights violation. Mack cites to no in- or out-of-circuit caselaw that supports his position. [Dkt. No. 165 at 21–23.] Indeed, other courts in this district have consistently held that a plaintiff must point to a use to succeed in their claim. *See, e.g.*, *Peck v. Robinson*, No. 19 C 3279, 2022 WL 16947896, at *3 (N.D. Ill. Nov. 15, 2022); *Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933, at *4 (N.D. Ill. Nov. 13, 2013), *on reconsideration in part on other grounds*, No. 12-CV-09158, 2014 WL 3535723 (N.D. Ill. July 11, 2014).

Even if Mack's confession had been "used" in his state criminal proceedings, he fails to show that a genuine issue of material fact that his confession was coerced as a matter of law. While the Court must rely on underlying historical facts to resolve

the question of whether police have employed sufficiently coercive tactics to render a confession involuntary, the underlying question itself is a legal one. *See Koh v. Ustich*, 933 F.3d 836, 844–45 (7th Cir. 2019). Barring any genuine issues of material fact (which are absent here given the parties' agreement on the underlying facts), the resolution of whether a confession was involuntary is for the Court to decide. *Id.*

There is no genuine issue of material fact that Mack's confession was not improperly coerced. It is true that some factors weigh in favor of finding that Mack's confession was involuntary: at the time of his interview with police, Mack was a seventeen-year-old high schooler who was without the presence of a friendly adult. [Dkt. No. 163 at ¶¶ 48–60; Dkt. No. 176 at ¶ 1.] He was repeatedly told that he would be sent to prison for fifty years if he did not tell the truth. [Dkt. No. 176 at ¶ 42.] But other factors weigh against that finding: the initial questioning itself was relatively short (sixteen minutes); Mack repeatedly waived his *Miranda* rights; and Mack was not physically coerced or deprived of food or sleep. [Dkt. No. 163 at ¶¶ 48–49, 58, 64.]

Weighing the totality of the circumstances, the Court concludes that Mack's confession was not coerced as a matter of law. Mack was interviewed for less than forty minutes in total (with his first interview lasting sixteen minutes), repeatedly given *Miranda* warnings, provided food and breaks, and was allowed to sleep. While Mack understandably focuses on his age, "the mere fact that [Mack] was [a minor] and questioned without an adult present does not by itself render his confession involuntary." *Hardaway*, 302 F.3d at 766. The statements that Roberts and Maderer made were not so overpowering that they rendered him inapplicable of rational

decision-making. *Alexander*, 329 F.3d at 918; *see, e.g.*, *Fare v. Michael C.*, 442 U.S. 707, 727 (1979) (holding a sixteen-year-old's confession voluntary, despite the lack of a friendly adult, police indicating a "cooperative attitude" would "benefit" him, and defendant's intermittent refusal to answer questions and weeping, given the lack of any factors indicating he did not understand his actions or that he was worn down by a lengthy questioning, trickery, or deceit).

The cases that Mack cites do not compel a different result.[19] In *Gallegos v. Colorado*, the Court's finding of coercion was not dependent on threats but still presents far more coercive circumstances than this case. 370 U.S. 49, 53–54 (1962) (confession violated due process given the age of the fourteen-year-old petitioner, his five-day detention, and the failure to send for his parents, to bring him before the Juvenile Court judge, or to ensure he had the advice of a lawyer or friend). In *Alexander v. DeAngelo*, the Court noted that a false promise of punishment "may" be deemed coerced. 329 F.3d 912, 918 (7th Cir. 2003). In *Johnson v. Trigg*, the Court found that the district court likely "erred" in concluding that a fourteen-year-old arrestee of below average intelligence was coerced into confessing by promises of releasing his mother from jail. 28 F.3d 639, 642, 645 (7th Cir. 1994).

Mack additionally argues that Roberts and Maderer made false promises or "suggestions" of leniency to coerce his confession, presumably a reference to the

---

[19]    Mack's citation to *In re Gault*, is inapplicable. That case appears to concern the application to the Fifth Amendment to confessions made by minors more generally. 387 U.S. 1, 45–50 (1967) (stating that the Fifth Amendment privilege against self-incrimination applies to both adults and children).

"leniency ploys" section of the Local Rule 56.1 Statement. [Dkt. No. 165 at 22–23; Dkt. No. 176 at ¶ 44.] If an officer makes a "false promise of leniency" and thus renders the arrestee incapable of rational decision-making, the confession may be deemed coerced. *Alexander*, 329 F.3d at 918; *see, e.g.*, *Johnson,* 28 F.3d at 641–42 (finding police officer's false promise to release the defendant's mother from jail coercive); *United States v. Rutledge*, 900 F.3d 1127, 1130 (7th Cir. 1990) (finding police officer's false promise that none of defendant's statements would be used against him coercive).

In the statements he highlights, Roberts told Mack that he did not believe Mack's account because it was contradicted by other witnesses' testimony, that his involvement was "not that big of a deal," and that he wanted the truth, not to "screw" Mack with prison time. [Dkt. No. 176 at ¶ 44.] None of these "ploys" were false promises of leniency or unduly coercive. Roberts and Maderer never promised Mack anything, false or otherwise. While arguably deceptive in their tone or implication, none of the identified statements rise to the level of "false promise of leniency." Rather, they more closely align as "actively mislead[ing]" Mack, which Roberts and Maderer were allowed to do. *Alexander*, 329 F.3d at 918. *Grayson v. Aurora*, on which Mack relies, involves a defendant who was promised he "could go home" for his cooperation. 157 F. Supp. 3d 725, 741 (N.D. Ill. 2016). This is readily distinguishable from this case.

Finally, Mack argues that Roberts and Maderer violated the Fourteenth Amendment substantive due process. [Dkt. No. 165 at 21.] Arrestees can bring a

Fourteenth Amendment substantive due process claim based on "police torture or other abuse that results in a confession." *Chavez*, 538 U.S. at 773. To maintain such a claim, the police's conduct must "shock the conscience." *See Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017). What constitutes "conscience shocking" conduct is open to interpretation, but courts consider police conduct "conscience shocking" when it comes "too close to the rack and the screw." *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)).

Mack's argument on this point consists of one sentence. *See generally* [Dkt. No. 165 at 21 ("The due process clause can apply to coerced confessions when the circumstances of the interrogation are grossly inappropriate.")]. This argument is underdeveloped at best. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). Nonetheless, no reasonable jury could find that Roberts and Maderer's conduct in Mack's interrogation shocked the conscience. *See Fox*, 600 F.3d at 841 (noting that while "[t]here is no clear-cut analysis to determine what constitutes 'conscience-shocking' conduct . . . forcing an emetic down a person's throat to forcibly extract evidence from a suspect's stomach shocks the conscience," while "lying to, threatening, or insulting a suspect does not" (internal citation omitted)). The Court grants summary judgment on Mack's Fourteenth Amendment claim as to Count Five.

### D. Count Six: Malicious Prosecution under the Fourteenth Amendment

Defendants move for summary judgment on Mack's malicious prosecution claim, Count Six. [Dkt. No. 150 at 17–19; Dkt. No. 175 at 17–19.] As Mack notified the Court earlier this year [Dkt. No. 131 at 1], the Supreme Court in *Thompson v.*

41

*Clark* recently recognized a Fourth Amendment claim under § 1983 for malicious prosecution, reversing the Seventh Circuit's refusal to recognize such a claim. 142 S. Ct. 1332, 1337 (2022). "[T]he gravamen of the Fourth Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful initiation of charges without probable cause." *Id.* The existence of probable cause, like in the unlawful detention context, defeats a Fourth Amendment malicious prosecution claim. *Burritt*, 807 F.3d at 249. Because the Court has concluded that the Individual Defendants at issue in this Count—Roberts, Maderer, and Davis—had sufficient probable cause to arrest Mack, the malicious prosecution claim likewise fails. *Id.*

### E. Counts Four, Five, and Seven: Conspiracy, Failure to Intervene, and Indemnification

Defendants move for summary judgment on Mack's conspiracy, failure to intervene, and indemnification claims—Counts Four, Five, and Seven respectively. [Dkt. No. 150 at 19–20; Dkt. No. 175 at 17, 19.] Mack does not oppose Defendants' arguments regarding these counts. [Dkt. No. 150.]

Because Mack's substantive constitutional claims do not survive summary judgment, neither can his derivative claims for conspiracy and failure to intervene claims. *See Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (failure to intervene); *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (conspiracy). And because no Individual Defendant is liable, the City need not indemnify them. *See Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994). Summary judgment is granted on Counts Four, Five, and Seven.

## V.   Conclusion

For the reasons stated above the Court grants Defendants' motion for summary judgment [Dkt. No. 145] and denies Mack's cross-motion for summary judgment [Dkt. No. 147]. A final judgment under Federal Rule of Civil Procedure 58 will enter in favor of Defendants and against Mack. Civil case terminated.

Enter: 19-cv-4001
Date:  July 25, 2023

_____
Lindsay C. Jenkins
United States District Judge